See also, D.C., 60 F.R.D. 381 and D.C., 372 F.Supp. 175.

**Ralph NADER et al., Plaintiffs**

v.

**Earl H. BUTZ et al., Defendants.**

**Civ. A. No. 148–72.**

United States District Court,
District of Columbia.

July 18, 1975.

William A. Dobrovir, Washington, D. C., for plaintiffs.

Irwin Goldbloom, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM B. JONES, Chief Judge.

The plaintiffs are Ralph Nader, Public Citizens, Inc., Federation of Homemakers, and Consumers Association of the District of Columbia. The defendants are Earl H. Butz, Secretary of Agriculture, and the Commodity Credit Corporation. This action was instituted on January 24, 1972, with the filing of plaintiffs' complaint, which was amended on February 8, 1972.

The complaint as amended alleged that the March 25, 1971 order of the then Secretary of Agriculture Clifford M. Hardin setting the level of price support for milk and milk products for the marketing year, April 1, 1971 through March 31, 1972, was illegal. That order set the level of support at $4.93 per hundredweight, which plaintiffs asserted resulted from exertion of pressures by Members of Congress and the promise or expectation of political contributions from the dairy interests to the reelection campaign of the then President Richard Nixon. As a result of those pressures and expectations, plaintiffs asserted that Secretary Hardin disregarded the statutory command to consider a number of factors in establishing the milk and milk products price supports. 7 U.S.C. § 1421(b) (1970). Plaintiffs further alleged that Secretary Hardin had by a March 12, 1971 order established the price support level for the April 1, 1971 through March 31, 1972 marketing year at $4.66 per hundredweight, which order was vacated 13 days later by the March 25, 1971 order. The amended complaint sought a judgment of this Court declaring the March 25, 1971 order illegal and enjoining the continuance of the price support level higher than the $4.66 figure established in the March 12 order. The injunction would enjoin the Secretary of Agriculture and the Commodity Credit Corporation, the government agency used to implement the mechanism of price supports for agricultural products. 7 U.S.C. §§ 1424, 1446a, 1446a-1 (1970).

Before this action was instituted in January 1972, Hardin had resigned as Secretary of Agriculture and defendant Butz was appointed to that office. Since price support levels for milk and milk products had to be established for each marketing year (7 U.S.C. § 1446(c) (1970)), Secretary Butz on March 9, 1972, announced that the $4.93 level would be continued for the marketing year commencing April 1, 1972, and ending March 31, 1973. Shortly after April 1, 1972, defendants moved to dismiss the amended complaint on the ground of mootness since the March 25, 1971 order terminated on March 31, 1972. Plaintiffs opposed that motion and filed a motion to further amend the complaint to include the 1972–73 order. On May 3, 1972, this Court dismissed the action as moot and denied plaintiffs' motion to amend the amended complaint.

On appeal the Court of Appeals concluded "that, in present circumstances, it cannot be said that the challenged determination for 1971–72 did not affect the determination for 1972–73, and we find that appellants [plaintiffs] were deprived of an opportunity to show that in fact it did." 154 U.S.App.D.C. 178, 179, 474 F.2d 426, 427 (1972). The Court of Appeals reversed this Court's order and remanded for further proceedings. *Id.*

On remand this Court revoked its May 3, 1972 order and granted plaintiffs leave to file their second amended complaint. Thereafter plaintiffs engaged in extensive pre-trial discovery. During that period Congress enacted the Act of August 10, 1973, Public Law 93–86, § 1(3), 87 Stat. 222. That legislation amended 7 U.S.C. § 1446, the statute that authorized the Secretary of Agriculture to establish price support levels for milk and milk products. The amendment directed the Secretary to provide price support at a figure between 80 and 90 percent of parity when pri-

or thereto the authorized level was to be between 75 and 90 percent of parity.[1] Prior to that amendment the price support for the marketing year commencing April 1, 1973, was set at $5.29 per hundredweight which was at the then statutory minimum of 75 percent of parity, an increase of $0.36 per hundredweight over the 1971–72 and 1972–73 support levels. Following the August 10, 1973 amendment, the price support for that year was, in accordance with the terms of the amended statute, increased to $5.61 per hundredweight, or to the 80 percent parity minimum. On April 1, 1974, the level was increased to $6.57 per hundredweight or 80 percent of parity (Affidavit of J. Phil Campbell, Under Secretary of Agriculture, May 23, 1974, attached to defendants' May 24, 1974 motion to dismiss).

Under date of May 9, 1974, defendants filed a motion for an indefinite stay of proceedings in this case. The ground asserted by defendants was that this Court was being asked to render a declaration respecting matters that were then being considered by the Judiciary Committee of the House of Representatives in its impeachment investigation of the then President of the United States, Richard Nixon. Plaintiffs opposed that motion. After argument of counsel, this Court on May 14, 1974, granted defendants' motion to stay and directed defendants to file a motion to dismiss.

On May 24, 1974, defendants filed their motion to dismiss. On June 19, 1974, plaintiffs filed their opposition to this motion and on the same date filed a motion to further amend the complaint and join additional parties defendant, as well as a motion for partial summary judgment. Thereafter defendants filed

oppositions to plaintiffs' motions, and the parties then filed briefs in support of their respective positions, with the last brief being filed on July 29, 1974.

While the impeachment proceedings against former President Nixon terminated upon his resignation from office on August 9, 1974, this Court has not felt that it has been in a position to act on the pending motions until this time. On July 29, 1974, John B. Connally was indicted. He was Secretary of the Treasury on March 25, 1971, when the 1971–72 challenged price support order was issued. The indictment charged him with receiving as a public official illegal gratuities, conspiring with another to commit certain offenses against the United States, and making false declarations before a grand jury. Those criminal charges, in part at least, involved the 1971–72 milk price support order, a subject matter of this civil litigation. To act on the pending motions in this case might have had an unfair effect on the pending criminal action. On April 17, 1975, Connally was found not guilty by the jury after trial. Thereafter the Special Prosecutor dismissed certain additional criminal charges which had been severed from the criminal trial.[2] So far as this Court is aware, there are no pending criminal actions against any party who was involved in the issuance of the alleged illegal 1971–72 milk price support order and, therefore, this Court can proceed to consider and act on the pending motions.

### I. Defendants' Motion to Dismiss

██ As has been recited, on May 24, 1974, defendants filed a motion to dismiss this action. The ground asserted for the motion is that any contro-

---

1. "The parity price is computed by a statutory formula designed to give the supported commodities the same purchasing power, in terms of goods and services purchased by farmers, that the commodities possess in a specified base period. 7 U.S.C. § 1301(a) (1970)." *Nader v. Butz*, 154 U.S.App.D.C. at 179 n. 1, 474 F.2d at 427 n. 1 (1972).

2. Prior to trial counts 2 and 3 of the indictment, involving the March 25, 1971 milk price order, were dismissed with consent of Government counsel and a superseding information charging the same offenses was filed. Connally was tried on the charges in the information and was found not guilty thereof on April 17, 1975.

versy that existed between the parties has become moot.

In support of their motion to dismiss this action as moot, defendants point out that the circumstances prevailing on August 21, 1972, when the Court of Appeals reversed and remanded this case, no longer exist. Both the March 25, 1971 and March, 1972 milk price orders have long since been superseded. In fact, on August 10, 1973, Congress amended the authorizing statute to increase the support price of milk to not less than 80 per centum of parity where prior thereto and particularly in 1971 and 1972 the minimum percentage was 75 percent. 7 U.S.C. § 1446, *as amended*, Act of August 10, 1973, Pub.L. No. 93–86, § 1(3), 87 Stat. 222. The effect of the amendment was to increase the support price from $5.29 per hundred pounds of manufacturing milk, which had been established for the marketing year commencing April 1, 1973, to $5.61 per hundred pounds from and after August 10, 1973. As of April 1974, the amended legislation increased the support price to $6.57 per hundred pounds (Affidavit of J. Phil Campbell, Under Secretary of Agriculture, May 23, 1974, attached to defendants' May 24, 1974 motion to dismiss).[3]

Whatever merit there may have been for the concern that the 1972–73 milk price order was tainted by the "improprieties charged to the 1971–72 determination," such taint can no longer be said to exist. Not only have those orders long since met their demise, but the Congress by the August 10, 1973 legislation required the Secretary of Agriculture to raise the price support to 80 per centum of parity. The complained of $4.93 price support for the years March 1971 to April 1973 was increased at the express direction of Congress to $5.61 in August 1973 and to $6.57 as of April 1974. Thus since at least August 1973, it cannot be said that the milk price support orders were tainted by the March 25, 1971 order.

Nor is plaintiffs' first amended complaint for injunctive relief any longer viable. There they ask that the Secretary of Agriculture, his agents, and subordinates be permanently enjoined "from continuing to support the price of milk at $4.93, or at any price higher than $4.66." For this Court to grant such relief would require it to find invalid the Act of August 10, 1973, Pub.L. No. 93–86, § 1(3), 87 Stat. 222. But the plaintiffs have not challenged that Act, and this Court is not aware of any reason for questioning its validity.

The plaintiffs contend that this Court should enter a declaratory judgment that the actions of former President Nixon with respect to the March 25, 1971 milk price support order were illegal. This Court would have jurisdiction to enter such declaratory relief only if this action presented an actual controversy between the parties. Article III of the Constitution controls and no advisory opinion can be rendered. *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

The plaintiffs argue that President Nixon in March 1971 acted illegally when he ordered the then Secretary of Agriculture Hardin to increase the price supports for political reasons. It is plaintiffs' contention that the "defendants and the White House assert that such decision making process is lawful, constitutional and proper and, moreover, assert their intention to continue so to make these decisions in the future." As evidence of that contention plaintiffs refer to a January 8, 1974 press release by the White House. There it was acknowledged that "overwhelming Congressional pressure—and the

---

3. It is interesting to note that at no time from at least January, 1972 to May 23, 1974, the date of the Campbell affidavit, was the actual United States average market price for milk as low as the support price. In January 1972, the market price exceeded the support price by 9¢ per hundred pounds and in May 1974, the market price exceeded the support price by $1.42 per hundred pounds. (Campbell affidavit, *supra.*)

political consequences of ignoring it—was the reason for the milk price support decision reached on March 23rd" 1971 by the then President. The press release recounted how after Secretary Hardin's March 12, 1971 announcement of an 80 percent parity price support for the 1971–72 marketing year, the milk industry lobbied Members of Congress for higher supports. This according to the press release, resulted in legislation being introduced to require the supports to be at least 85 percent and in some cases 90 percent of parity. The press release acknowledged that the then President and his advisors believed a veto of such legislation to be politically undesirable, particularly with the 1972 presidential campaign but a little more than a year away.

Nowhere in the press release is there to be found any statement that the March 23, 1971 presidential "decision making process [was] lawful, constitutional and proper." Nor did that release assert the intention of the then President and his advisors "to continue so to make these decisions in the future."

Plaintiffs also point to a "Memorandum of White House Custodian of Records In Support of Claim of Executive Privilege" as evidence of a continuing government intention to illegally set milk price supports. This memorandum was filed with this Court on January 18, 1973, and was signed by counsel of the Department of Justice who represented the Custodian as well as the defendants in this case. In that memorandum counsel were arguing that the papers of the President and his aides, as well as those of the Secretary of Agriculture, relating to milk price support decisions were entitled to the protection of the doctrine of executive privilege. In developing this argument, counsel asserted that, "while the Secretary [of Agriculture] has the statutory responsibility for effecting the [milk price support] decision," the decision

of necessity involves presidential consideration since Article II, section 3, of the Constitution imposes on the President the duty to "take [c]are that the [l]aws be faithfully executed." The memorandum asserts that the price support determination is "a major federal action having consequences not only with respect to the adequacy of the supply of milk nationwide but also with respect to the broadest economic considerations, including the range of commitment of the federal budget and the impact of such a decision on foreign agricultural commerce." The thrust of the memorandum is that the Secretary of Agriculture must advise and consult with the President and others who participate in the functions of the executive department. But the memorandum asserts that it is the Secretary who makes the "statutory determination"; it is he who "has the statutory responsibility for effecting the decision."

But even if the March 25, 1971 milk price support order was the illegal and unauthorized act of the then President of the United States and that that order tainted the March 1972 order, those orders have long since been superseded and their effect spent. The August 1973 amendatory legislation required subsequent milk orders to be at least 80 per centum of parity and, as the evidence shows, they have been. And there is no evidence that the alleged illegal action of March 1971 has been or is intended to be continued in the future. Secretary of Agriculture Hardin resigned his office on or about November 15, 1971. (Amended Complaint, ¶ 5). Defendant Butz succeeded Hardin and is the incumbent Secretary of Agriculture. He is only charged by the plaintiffs with continuing the price support level set by Hardin on March 25, 1971 for the 1972–73 marketing year. Since the August 1973 amendatory legislation, Butz has consistently conformed to the congressional directive. He at no time has stated or otherwise indicated that he intends to do otherwise.

Former President Nixon resigned his office on August 9, 1974. Whatever intentions for future milk price support orders plaintiffs may have imputed to him are no longer justified since the date of his resignation. His successor, President Ford, is not charged by plaintiffs with having acted illegally or intending to do so with respect to future milk orders. This Court assumes, as the Supreme Court did with respect to the officials in *O'Shea v. Littleton*, 414 U.S. 488, 497, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), that he will conduct his activities within the law.

Notwithstanding the factual situation here, plaintiffs rely principally on the Supreme Court's opinion in *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), as authority for holding that the subject matter of this case is not moot. In that case employees of Super Tire Engineering Co. engaged in a strike against their employer and an affiliated Company. While on strike the employees received public assistance through two New Jersey public welfare statutes pursuant to regulations issued and administered by certain state officials. The plaintiff employers sought a declaration that those regulations were null and void because in awarding benefits to striking workers they constituted an interference with the federal labor policy of free collective bargaining expressed in the Labor Management Relations Act, 1947, 29 U.S.C. § 141 *et seq.*, as well as with other federal policies pronounced in certain provisions of the Social Security Act of 1935. Plaintiff employers also sought to enjoin the New Jersey Welfare Administrator from making public funds available to the striking employees. On the hearing of the plaintiffs' motion for a preliminary injunction, the intervening labor union contended that the case was moot because the striking employees voted to

return to work, which they did within two or three days thereafter. While the District Court denied the motion and dismissed the action for reasons other than mootness, the Court of Appeals remanded the case with instructions to vacate and dismiss as moot. On review, the Supreme Court reversed the Court of Appeals and remanded for further proceedings on the merits of the controversy. In holding the case not to be moot the Court recognized that "New Jersey has declared positively that ablebodied striking workers who are engaged, individually and collectively in an economic dispute with their employers are eligible for economic benefits. This policy is fixed and definite. It is not contingent upon executive discretion." 416 U.S. at 123–24, 94 S.Ct. at 1699.

Unlike the policy fixing state statutes and implementing regulations in *Super Tire Engineering Co.*, there are no statutes or regulations providing that milk price supports are to be determined on political considerations. Indeed none are more assertive than plaintiffs that the opposite is true. They have strenuously contended from the beginning that the fixed and definite policy with respect to milk price supports is declared by statute to be that the Secretary of Agriculture set the price based only upon economic considerations. *See* 7 U.S.C. § 1446(c). They argue that if the Secretary had conformed his acts to the statute, they would not be adversely affected.[4]

This case is analogous to *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). Zwickler in 1964 had distributed an anonymous handbill criticizing a Congressman, standing then for re-election, for opposing two amendments to the 1964 Foreign Aid Bill. Zwickler had been convicted for that activity as violating a New York Election Law provision making such

4. *Goosby v. Osser*, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973), is also cited by plaintiffs. But like *Super Tire Engineering*

*Co.*, the fixed and definite state policy is that set forth in the Pennsylvania Election Code enacted by the legislature.

anonymous distribution illegal. His conviction had been set aside, but constitutional questions had not been reached. Zwickler brought a civil action in the United States District Court to have the New York statute declared unconstitutional since he intended to distribute a similar handbill during the 1966 campaign with respect to the same Congressman. However, since the 1964 election the Congressman had resigned his seat in the House of Representatives and was appointed a judge of the Supreme Court of New York. The Supreme Court of the United States directed the dismissal of the action after finding that a controversy requisite for relief under the Declaratory Judgment Act (28 U.S.C. § 2201) did not exist. The Court quoted from its prior opinions as follows (394 U.S. at 108, 89 S.Ct. at 959):

> "[T]he federal courts established pursuant to Article III of the Constitution do not render advisory opinions. For adjudication of constitutional issues, 'concrete legal issues, presented in actual cases, not abstractions,' are requisite. This is as true of declaratory judgments as any other field." *United Public Workers of America v. Mitchell,* 330 U.S. 75, 89 [67 S.Ct. 556, 564, 91 L.Ed. 754] (1947). "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273 [61 S.Ct. 510, 512, 85 L.Ed. 826] (1941).

The Court held that "under all the circumstances of the case the fact that it was most unlikely that the [former] Congressman would again be a candidate for Congress precluded a finding that there was 'sufficient immediacy and reality' here" to warrant the issuance of a declaratory judgment. 394 U.S. at 109, 89 S.Ct. at 960. Here the former President of the United States, whom plaintiffs charge with illegal action in connection with the milk price support order of March 25, 1971, will never be eligible to be elected President. Having been elected to that office twice, he is precluded from serving again. U.S. Const. Amend. XXII. Thus there is no "sufficient immediacy and reality" for the issuance of the declaratory judgment plaintiffs seek. In short, the claims asserted by plaintiff in their amended complaint are moot and will be dismissed.

## II. Plaintiffs' Motion to Amend

But plaintiffs would avoid the dismissal of this action as being moot by seeking an order of this Court to allow them to file a second amended complaint. The second amended complaint would add to the orginal defendants the Attorney General, the United States Attorney for the District of Columbia, three cooperative marketing associations of dairy farmers, four political committees which receive political contributions from the farmer members of the three cooperatives, former President Nixon, and five who had been members of his personal staff: H. R. Haldeman, Charles W. Colson, John D. Ehrlichman, John C. Whitaker, and Gordon Strachan. That complaint requests the following relief: (1) A declaratory judgment that the March 25, 1971 milk price support order was illegal; (2) a permanent injunction against the Secretary of Agriculture prohibiting him from issuing any future order except in the circumstances authorized by the price support statute and from increasing the price supports on orders from the former President when to do so would be con-

trary to the criteria specified by the statute; (3) an accounting by, and the imposition of a constructive trust in favor of all consumers of milk and milk products upon the three dairy cooperatives and the four political committees; (4) an accounting by and a constructive trust *ex maleficio,* in favor of the United States on the funds of former President Nixon, Haldeman, Ehrlichman, Colson, and Whitaker for the amounts contributed directly or indirectly by the four defendant political committees for the 1972 campaign to re-elect Richard Nixon; (5) an order in the nature of a mandamus directing the Attorney General and the United States Attorney to prosecute civil claims of the United States for false claims under 31 U.S.C. § 231, for fraud at common law, and for breach of trust; (6) an order requiring the Secretary of Agriculture and the Commodity Credit Corporation to reduce the amount of any future price support increases and price support purchases pro rata for the next 10 years until the reductions equal the amount by which the dairy industry was enriched by reason of the March 25, 1971 price support order; (7) a permanent injunction against the four defendant political committees from continuing to collect contributions from dairy farmer members of the three dairy cooperative defendants and from making and continuing to make campaign contributions to candidates for federal office.

The alleged factual support for the claimed relief is set forth in detail in the proposed second amended complaint. After reciting the statutory duty of the Secretary of Agriculture to fix support levels, and noting the two March 1971 price support orders, the plaintiffs allege arrangements by some of the defendants and others to obtain dairy industry contributions for the 1972 campaign to re-elect Richard Nixon as President, the payment and promise of payments of such funds to the campaign effort and the concurrent March 25, 1971 order increasing for political reasons the price supports for milk and milk products, the use of some of such funds, as well as the resulting costs to the United States Treasury, and the excess payments by consumers of dairy products.

1. The declaratory and injunctive relief sought by the proposed second amended complaint with respect to the illegality of the March 25, 1971 price support order and any future orders by the Secretary of Agriculture is essentially the same relief sought by the first amended complaint. For the reasons stated in Part I of this Memorandum Opinion with respect to the mootness of the claims asserted by the first amended complaint, there is no justification for such declaratory and injunctive relief sought by the proposed second amended complaint.

2. Notwithstanding the claim (Second Amended Complaint ¶ 44) for injunctive relief to compel the Secretary of Agriculture to fix future price supports for milk and milk products in accordance with the statutory criteria (7 U.S.C. § 1446(c)), the plaintiffs in their proposed second amended complaint also seek a mandatory injunction which would require the Secretary and the Commodity Credit Corporation "to reduce the amount of future price support increases and price support purchases pro rata for the next 10 years, until said reductions equal the amount by which the dairy industry was enriched by reason of the 1971 price support increase * * *." (Second Amended Complaint ¶ 49.) Such a mandatory injunction would not only compel the Secretary to disregard the statutory criteria, such as the minimum per centum of parity,[5] but would result as well

---

5. Between August 10, 1973, and March 31, 1975, the minimum was 80 per centum of parity; since the latter date the minimum reverted to the original 75 per centum. 7 U.S.C. § 1446(c).

in this Court ordering the Secretary to disregard the very Act of Congress which plaintiffs have argued the former President unconstitutionally disregarded when he allegedly compelled former Secretary Hardin to increase the support price on March 25, 1971. On page 11 of their Opposition To [Defendants'] Motion to Dismiss, plaintiffs contend "[T]he President's substitution of his political judgment for the economic judgment of the Secretary of Agriculture amounted to a usurpation of congressional power and 'breach of the national fundamental law'—the separation of powers * * *." But the separation of powers doctrine is as binding on the judicial department as on the executive branch, as plaintiffs recognize on page 16 of their Opposition To [Defendants'] Motion to Dismiss. Hardly can it be said that such a claim for illegal relief argues in favor of permitting plaintiffs to file their second amended complaint.

3. Plaintiffs assert that former President Nixon, Ehrlichman, Colson, Haldeman, the three dairy cooperative marketing associations, the four dairy political committees, "together with others," conspired and caused the milk price support levels to be raised in 1971–72 for political considerations, including payments and promises of payments to the Nixon 1972 re-election campaign. They further argue that these actions resulted in injury to plaintiffs and "all other taxpayers" in the amount of $126,200,000 in excess payments from the United States Treasury for purchases to support the price of milk and milk products. The results of that conspiracy, so assert plaintiffs, violated criminal statutes 15 U.S.C. § 714m(b)(iii) and (d), and 18 U.S.C. § 371 as well as making such persons civilly liable for making false claims against the Government as provided in 31 U.S.C. § 231.

To recover such civil damages for the United States, the second amended complaint seeks a mandatory injunction against the United States Attorney for the District of Columbia and the Attorney General of the United States to institute an appropriate civil action. Title 31, section 233, of the United States Code makes it "the duty of the several United States Attorneys for the respective districts, for the District of Columbia, and for the several Territories, to be diligent in inquiring into any violation of the provisions of section 231 of this title by persons liable to such suit, and found within their respective districts or Territories, and cause them to be proceeded against in due form of law for the recovery of such forfeiture and damages. * * *" Plaintiffs assert that they have demanded of the United States Attorney for the District of Columbia and the Attorney General that each "perform the duties imposed upon him" to prosecute civil claims of the United States against the persons and instrumentalities above referred to and that each officer has declined to take such action.

Defendants' Opposition to Plaintiffs' Motion to Amend the Complaint makes known that plaintiffs' "demands" made on the United States Attorney and Attorney General were referred by them to the Special Prosecutor of Watergate matters. Under date of June 11, 1974, the then Deputy Special Prosecutor Ruth[6] addressed a letter to William A. Dobrovir, one of plaintiffs' counsel, in which the latter was advised that the Special Prosecutor's Office would examine all aspects of plaintiffs' demand and would, thereafter, determine "what action, if any, to take in accord with our best judgment after considering all relevant factors." (Defendants' Opposition to Plaintiffs' Motion to Amend Complaint, Appendix A.).

6. Special Prosecutor Jaworski having resigned on October 25, 1974, Ruth is now the Special Prosecutor.

**400**

The office of Watergate Special Prosecution Force was created by regulation of the Attorney General. The office is under the direction of the Special Prosecutor. To the latter there is assigned and delegated, among other things, authority "to conduct any kind of a legal proceeding, *civil* or criminal, including grand jury proceeding, *which United States Attorneys are authorized by law to conduct* and to designate attorneys to conduct such legal proceedings." 38 Fed.Reg. 30738 (Nov. 2, 1973), *as amended,* 38 Fed.Reg. 32805 (Nov. 19, 1973) (emphasis supplied). This regulation as long as extant has the force of law. *United States v. Nixon,* 418 U. S. 683, 694–95, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

Thus it is the Special Prosecutor who by operation of law is the government official that has the responsibility to determine what action, if any, he should take with respect to the question of liability of persons making false claims against the United States. 31 U.S.C. § 231. The matter has been referred to the Special Prosecutor as his June 11, 1974 letter to plaintiffs' counsel reveals. In such circumstances plaintiffs' claim for relief in the nature of mandamus to compel the United States Attorney and Attorney General to act is not cognizable even if it otherwise might be.

4. By their second amended complaint plaintiffs would allege that former President Nixon, Haldeman, Ehrlichman, Colson, and Whitaker, while public officials of the United States, obtained at least $727,000 for the 1972 campaign to re-elect Richard Nixon. This resulted, according to plaintiffs, from those former officials agreeing and conspiring to increase the 1971 price support level for milk. The second amended complaint would request that this Court require an accounting by those former officials and impose a constructive trust on their funds for the amounts contributed by the four dairy political committees for the 1972 campaign to re-elect Nixon.

Plaintiffs would prosecute their second amended complaint "on their own behalf and on behalf of all consumers of milk and milk products, and of all taxpayers." But as either consumers of milk or taxpayers, they lack standing to bring this claim. *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); see *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Warth v. Selden,* —— U.S. ——, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

5. The second amended complaint would also allege that the four dairy political committees have continued to collect periodic contributions from dairy farmer members of the three dairy cooperative marketing associations and have continued to make political contributions for the purpose of influencing governmental decisions favorable to their economic interests. Since, as plaintiffs aver, those committees intend to continue collecting from the farmers and making such political contributions, the second amended complaint would have this Court enjoin the committees from so collecting and from continuing to make campaign contributions to candidates for federal office.

Plaintiffs assert that the four committees are political committees within the definitions of the Federal Corrupt Practices Act, former sections 241 *et seq.* of Title 2 U.S.C. and the Federal Election Campaign Act of 1971, 2 U.S. C. §§ 431 *et seq.* As such they would be subject to the provisions of those Acts.

On October 15, 1974, which was subsequent to the date plaintiffs filed their motion to amend their complaint for a second time, there was enacted into law the Federal Election Campaign Act Amendments of 1974, Pub.L. No. 93–443, 88 Stat. 1263. This Act, among other things, amended certain sections of the criminal code, including 18 U.S.C. § 608, and the Federal Election Cam-

paign Act of 1971, including 2 U.S.C. §§ 432–34.

The Federal Elections Campaign Act Amendments of 1974 is the law existing at this time, and this Court would be required to decide plaintiffs' second amended complaint claim for injunctive relief against the former dairy political committees for any alleged violations in future elections by applying that Act, pertinent criminal statutes, including 18 U.S.C. § 608, as amended, and pertinent provisions of the Federal Election Campaign Act of 1971, as amended. *Cort v. Ash,* —— U.S. ——, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

Section 208 of the Federal Elections Campaign Act Amendments of 1974, by amending section 310 of the Federal Elections Campaign Act of 1971, established a Federal Election Commission. "Any person who believes a violation of this Act or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18 [United States Code as amended] has occurred may file a complaint with the Commission." Pub.L. No. 93–443, § 208, 88 Stat. 1284 *adding* Federal Election Campaign Act § 314. Section 310(b), as amended, provides that the Commission has "primary jurisdiction" with respect to the civil enforcement of those statutory provisions. When a complaint is made to the Commission by a person, it is to report such complaint to the Attorney General and is to make its own investigation of the complained of violation. Pub.L. No. 93–443, § 208, 88 Stat. 1284, *adding* Federal Election Campaign Act § 314(a)(2)(A) and (B). If, following an investigation by the Commission, it believes a person has engaged in, or is about to engage in any acts or practices which constitute or will constitute violations of the Federal Election Campaign Act of 1971, as amended, it may endeavor to correct such violations by, among other things, instituting a civil action for injunctive relief against a person believed to be engaging in such illegal conduct. Also the Commission may refer past or future apparent vio-

lations of the 1971 Act, as amended, and the criminal code to the Attorney General, who upon request of the Commission is to institute a civil action for relief, including injunctive relief against the apparent violator.

In view of the primary jurisdiction vested in the Commission over the claimed dairy committee past and future violations, the plaintiffs, as taxpayers and milk consumers, as well as the class they would represent, must pursue the statutory remedy of a complaint to the Commission and invoke its authority to institute or to request the Attorney General to institute a civil action for the equitable relief they would seek in their second amended complaint. *Cort v. Ash,* —— U.S. ——, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

6. The final claim plaintiffs would assert by the second amended complaint is that the three dairy cooperative marketing associations and the four dairy political committees were illegally enriched by the March 25, 1971 milk price support order. Plaintiffs would have this Court require those dairy organizations to account for such enrichment as well as impose upon them a constructive trust in favor of all consumers of milk and milk products. Moreover, the plaintiffs would have this Court issue a mandatory injunction ordering those organizations to establish a reserve and to charge against that reserve until it is exhausted any future increases in prices of milk and dairy products that may be permitted "by federal price support determinations, federal milk marketing orders, or otherwise."

The lawsuit as instituted, and as prosecuted by the first amended complaint, was against the Secretary of Agriculture and the Commodity Credit Corporation. The relief sought was to declare the 1971–72 milk price support orders illegal and to enjoin the continuance of the price support level higher than the $4.66 figure established by the March 12, 1971 order. But now plaintiffs by this last claim in its proposed

second amended complaint would in part convert this case into a private action by plaintiffs against seven dairy organizations which at no time heretofore have been parties to the action. Whatever merit, if any, there might be to a separate action by plaintiffs against those dairy organizations does not justify granting plaintiffs' motion to file a second amended complaint. *See Watson v. Employers Liability Assurance Corp.*, 202 F.2d 407 (5th Cir. 1953), *rev'd on other grounds*, 348 U.S. 66, 75 S.Ct. 166, 99 L.Ed. 74 (1954). Moreover, it is also worthy of note in this connection that a month by month statistical summary submitted by the defendants indicates that the market price, or average price received by farmers for manufacturing milk, has exceeded the support price for every month from January 1972 to and including April 1974. (Affidavit of J. Phil Campbell, Under Secretary of Agriculture, May 23, 1974, attached to defendants' May 24, 1974 motion to dismiss); *see* note 3 *supra*.

7. An order will be entered denying plaintiffs' motion to file a second amended complaint.

### III. *Plaintiffs' Motion for Partial Summary Judgment*

Plaintiffs seek a partial summary judgment in the form of a declaratory decree that the March 25, 1971 milk price support order was unconstitutional and unlawful and a permanent injunction enjoining the Secretary of Agriculture from issuing any milk price support orders in the future not in accord with 7 U.S.C. §§ 1421 and 1446.

From what has been said in this Memorandum Opinion, there is no basis for granting such a judgment. The motion will be denied.

### IV. *In Camera Materials*

During the pendency of this action certain material has been furnished this Court for *in camera* inspection and determination. Since this case is being dismissed, that material will be returned to defendants' counsel.