## SUPER TIRE ENGINEERING CO. ET AL. *v.* McCORKLE ET AL.

No. 72–1554. Argued January 15, 1974—Decided April 16, 1974

BLACKMUN, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, WHITE, and MARSHALL, JJ., joined. STEWART, J., filed a dissenting opinion, in which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined, *post*, p. 127.

*Lawrence M. Cohen* argued the cause for petitioners. With him on the briefs were *Herbert G. Keene, Jr.,* and *James A. Young.*

*Stephen Skillman,* First Assistant Attorney General of New Jersey, argued the cause for respondents McCorkle et al. With him on the briefs were *George F. Kugler, Jr.,* former Attorney General, *William F. Hyland,* Attorney General, and *Jane Sommer* and *Paul N. Watter,* Deputy Attorneys General. *Robert F. O'Brien* argued the cause and filed briefs for respondent Teamsters Local Union No. 676.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

In New Jersey, workers engaged in an economic strike are eligible for public assistance through state welfare programs. Employers whose plants were struck insti-

---

*Briefs of *amici curiae* were filed by *Milton Smith, Gerard C. Smetana,* and *Jerry Kronenberg* for the Chamber of Commerce of the United States, and by *J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations.

tuted this suit for injunctive and declaratory relief against such eligibility. Before the case was tried, the labor dispute was settled and the strike came to an end. The question presented is whether a "case" or "controversy" still exists, within the meaning of Art. III, § 2, of the Constitution, and of the Declaratory Judgment Act, 28 U. S. C. §§ 2201–2202.

## I

A collective-bargaining agreement between petitioners Super Tire Engineering Company and Supercap Corporation, affiliated New Jersey corporations,[1] and Teamsters Local Union No. 676, the certified collective-bargaining representative for the two corporations' production and maintenance employees, expired on May 14, 1971. Because a new agreement had not as yet been reached, the employees promptly went out on strike. Some four weeks later, with the strike continuing, the two corporations, and their president and chief executive officer, filed the present suit in the United States District Court for the District of New Jersey against various New Jersey officials.[2]

The complaint alleged that many of the striking employees had received and would continue to receive pub-

---

[1] Super Tire Engineering Company is engaged in the business of truck tire sales and service and the manufacture and sale of industrial polyurethane tires and wheels. Supercap Corporation is engaged in the business of truck tire recapping and repairing.

[2] The named defendants were Lloyd W. McCorkle, Commissioner of the Department of Institutions and Agencies of the State of New Jersey; Irving J. Engelman, Director of the Division of Public Welfare of the Department of Institutions and Agencies of the State of New Jersey; Fred L. Streng, Director of the Camden County, New Jersey, Welfare Board; and Juanita E. Dicks, Welfare Director of the Municipal Welfare Department of the City of Camden, New Jersey.

lic assistance through two New Jersey public welfare programs,[3] pursuant to regulations issued and administered by the named defendants. The petitioners sought a declaration that these interpretive regulations,[4] accord-

---

[2] The General Public Assistance Law, N. J. Stat. Ann. § 44:8–107 et seq. (Supp. 1973–1974), a state program, and the Assistance for Dependent Children Law (ADC), N. J. Stat. Ann. § 44:10–1 et seq. (Supp. 1973–1974), a federal-state program created by § 402 of the Social Security Act, as amended, 42 U. S. C. § 602.

Effective June 30, 1971, New Jersey elected no longer to participate in the unemployed parent segment of the AFDC program, and enacted, in its place, the Assistance to Families of the Working Poor program, N. J. Stat. Ann. § 44:13–1 et seq. (Supp. 1973–1974).

[4] The Regulations (M. A. 1.006, revised Mar. 1957), issued by the New Jersey Department of Institutions and Agencies under the General Public Assistance Law, provided in pertinent part:

"A. Citation of Statute and Constitution

"Chapter 156, P. L. 1947 (R. S. 44:8–108) defines reimbursable public assistance as 'assistance rendered to needy persons not otherwise provided for under the laws of this State, where such persons are willing to work but are unable to secure employment due either to physical disability or inability to find employment.'

"The Constitution of New Jersey 1947, Article I, paragraph 19, guarantees that 'Persons in private employment shall have the right to organize and bargain collectively.'

"B. Interpretation and Policy

"It may be inferred from the quoted section of the statute that persons unwilling to work are ineligible for public assistance. However, for purposes of public administration, the phrase 'unwilling to work' must be defined as objectively as possible.

". . . The Constitutional guarantee of the 'right to organize and bargain collectively' implies the right of the individual to participate in a bona fide labor dispute as between the employer and the collective bargaining unit by which the individual is represented. Moreover, a 'strike,' when lawfully authorized and conducted, is recognized as an inherent and lawful element of the process of bargaining collectively and of resolving labor disputes. Accordingly, when an individual is participating in a lawful 'strike,' he

ing benefits to striking workers, were null and void because they constituted an interference with the federal labor policy of free collective bargaining expressed in the Labor Management Relations Act, 1947, 29 U. S. C. § 141 *et seq.,* and with other federal policy pronounced in provisions of the Social Security Act of 1935, *viz.,* 42 U. S. C. §§ 602 (a)(8)(C), 606 (e)(1), and 607 (b)(1)(B).[5] The petitioners also sought injunctive relief against the New Jersey welfare administrators' making public funds available to labor union members engaged in the strike.

may not be considered merely because of such participation, as refusing to work without just cause.

"C. Regulations

"Based on the foregoing statement of interpretation and policy, the following regulations are established:

"4. No individual shall be presumed to be unwilling to work, or to be wrongfully refusing to accept suitable employment, merely because he is participating in a lawful labor dispute.

"5. An individual who is participating in a lawful labor dispute, and who is needy, has the same right to apply for public assistance, for himself and his dependents, as any other individual who is needy.

"6. In the case of an applicant for public assistance who is participating in a lawful labor dispute, there shall be an investigation of need and other conditions of eligibility, and an evaluation of income and resources, in the same way and to the same extent as in all other cases. In such instances, 'strike benefits' or other payments available to the individual from the labor union or other source, shall be considered a resource and shall be determined and accounted for."

. The record is not clear as to the eligibility of strikers under New Jersey's newly enacted program of Assistance to Families of the Working Poor. Petitioners state that striking workers are eligible for benefits under that program. Brief for Petitioners 4 n. 1. The respondents concede this, as "a matter of administrative application." Tr. of Oral Arg. 46.

. [5] The complaint also alleged that the inclusion of striking workers in these programs was contrary to New Jersey law. .

With their complaint, the petitioners filed a motion for a preliminary injunction. The supporting affidavit by the individual petitioner recited the expiration of the collective-bargaining agreement, the failure of the parties to reach a new agreement, the commencement and continuation of the strike, the application by many of the strikers for state welfare benefits, and their receipt of such benefits from the beginning of the strike to the date of the affidavit. The affiant further stated that the availability of these benefits interfered with and infringed upon free collective bargaining as guaranteed by Congress and "hardened the resolve of the said strikers to remain out of work in support of their bargaining demands," App. 32, and, in addition, that

> "the current strike will undoubtedly be of longer duration than would have otherwise been the case; that the impact of the grant of welfare benefits and public assistance to the strikers involved has resulted in the State of New Jersey subsidizing one party to the current labor dispute; and that such subsidization by the State has resulted in upsetting the economic balance between employer and employees otherwise obtained in such a labor dispute."
> *Ibid.*

At the hearing held on June 24 on the motion for preliminary injunction, the union, now a respondent here, was permitted to intervene. App. 37. Counsel for the union contended that "this entire matter . . . has been mooted" because "these employees voted to return to work and are scheduled to return to work tomorrow morning." [6] App. 39. The District Court, nonetheless, pro-

---

[6] All the strikers returned to work by Monday, June 28, 1971, and normal operations at the corporate petitioners' plants were then resumed.

ceeded to the merits of the dispute and, on the basis of the holding in *ITT Lamp Division* v. *Minter,* 435 F. 2d 989 (CA1 1970), cert. denied, 402 U. S. 933 (1971), ruled that the appropriate forum for the petitioners' claim was the Congress, and that the New Jersey practice of according aid to striking workers was not violative of the Supremacy Clause of the Constitution. The court denied the motion for preliminary injunction and dismissed the complaint. App. 45–46. On appeal, the United States Court of Appeals for the Third Circuit, by a divided vote, did not reach the merits but remanded the case with instructions to vacate and dismiss for mootness. 469 F. 2d 911, 922 (1972). We granted certiorari to consider the mootness issue. 414 U. S. 817 (1973).

## II

The respondent union invites us to conclude that this controversy between the petitioners and the State became moot when the particular economic strike terminated upon the execution of the new collective-bargaining agreement and the return of the strikers to work in late June. That conclusion, however, is appropriate with respect to only one aspect of the lawsuit, that is, the request for injunctive relief made in the context of official state action during the pendency of the strike.

The petitioners here have sought, from the very beginning, *declaratory* relief as well as an injunction. Clearly, the District Court had "the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction." *Zwickler* v. *Koota,* 389 U. S. 241, 254 (1967); *Roe* v. *Wade,* 410 U. S. 113, 166 (1973); *Steffel* v. *Thompson,* 415 U. S. 452, 468–469 (1974). Thus, even though the case for an injunction dissolved with the subsequent settlement of the strike and the strikers'

return to work, the parties to the principal controversy, that is, the corporate petitioners and the New Jersey officials, may still retain sufficient interests and injury as to justify the award of declaratory relief. The question is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.*, 312 U. S. 270, 273 (1941). And since this case involves governmental action, we must ponder the broader consideration whether the short-term nature of that action makes the issues presented here "capable of repetition, yet evading review," so that petitioners are adversely affected by government "without a chance of redress." *Southern Pac. Terminal Co.* v. *ICC*, 219 U. S. 498, 515 (1911).

A. We hold that the facts here provide full and complete satisfaction of the requirement of the Constitution's Art. III, § 2, and the Declaratory Judgment Act, that a case or controversy exist between the parties. Unlike the situations that prevailed in *Oil Workers Unions* v. *Missouri,* 361 U. S. 363 (1960), on which the Court of Appeals' majority chiefly relied, and in *Harris* v. *Battle,* 348 U. S. 803 (1954), the challenged governmental activity in the present case is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties.

In both *Harris* and *Oil Workers* a state statute authorized the Governor to take immediate possession of a public utility in the event of a strike or work stoppage that interfered with the public interest. The seizure was not automatic for every public utility labor dis-

pute. It took effect only upon the exercise of the Governor's discretion. In each case the Court held the controversy to be moot because both the seizure and the strike had terminated prior to the time the case reached this Court. The governmental action challenged was the authority to seize the public utility, and it was clear that a seizure would not recur except in circumstances where (a) there was another strike or stoppage, and (b) in the judgment of the Governor, the public interest required it. The question was thus posed in a situation where the threat of governmental action was two steps removed from reality. This made the recurrence of a seizure so remote and speculative that there was no tangible prejudice to the existing interests of the parties and, therefore, there was a "want of a subject matter" on which any judgment of this Court could operate. *Oil Workers,* 361 U. S., at 371. This was particularly apparent in *Oil Workers* because, although the union had sought both declaratory and injunctive relief, the decision the Court was asked to review "upheld only the validity of an injunction, an injunction that expired by its own terms more than three years ago." *Ibid.*

The present case has a decidedly different posture. As in *Harris* and *Oil Workers,* the strike here was settled before the litigation reached this Court. But, unlike those cases, the challenged governmental action has not ceased. The New Jersey governmental action does not rest on the distant contingencies of another strike and the discretionary act of an official.[7] Rather, New Jersey has declared positively that able-bodied striking workers who are engaged, individually and collectively, in an

---

[7] Although the threat of seizure in *Oil Workers* constituted a far more severe form of governmental action, going as it did to cripple any strike, the features of that action were inexorably contingent, serving to make it more remote and speculative.

124

economic dispute with their employer are eligible for economic benefits. This policy is fixed and definite. It is not contingent upon executive discretion.[8] Employees know that if they go out on strike, public funds are available. The petitioners' claim is that this eligibility affects the collective-bargaining relationship, both in the context of a live labor dispute when a collective-bargaining agreement is in process of formulation, *and* in the ongoing collective relationship, so that the economic balance between labor and management, carefully formulated and preserved by Congress in the federal labor statutes, is altered by the State's beneficent policy toward strikers. It cannot be doubted that the availability of state welfare assistance for striking workers in New Jersey pervades every work stoppage, affects every existing collective-bargaining agreement, and is a factor lurking in the background of every incipient labor contract. The question, of course, is whether Congress, explicitly or implicitly, has ruled out such assistance in its calculus of laws regulating labor-management disputes. In this sense petitioners allege a colorable claim of injury from an extant and fixed policy directive of the State of New Jersey. That claim deserves a hearing.

The decision in *Bus Employees* v. *Missouri*, 374 U. S. 74 (1963), is not to the contrary. In that case the Court adjudicated the merits of the same statutory scheme that had been challenged earlier in *Oil Workers*. It reached the merits even though the Governor had terminated the seizure of the public utility. His exec-

---

[8] It may not appropriately be argued that there is an element of discretion present here in the making of the determination of individual "need" for welfare benefits. That determination has no measurable effect on the rights of the corporate petitioners. Instead, it is the basic eligibility for assistance that allegedly prejudices those petitioners' economic position.

utive order, however, recited that the labor dispute "remains unresolved." The Court's rationale was that, since the labor dispute had not ended, "[t]here thus exists in the present case not merely the speculative possibility of invocation of the King-Thompson Act in some future labor dispute, but the presence of an existing unresolved dispute which continues subject to all the provisions of the Act. Cf. *Southern Pac. Terminal Co.* v. *Interstate Commerce Comm'n,* 219 U. S. 498, 514–516; *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 632." 374 U. S., at 78. The existence of the strike was important in that it rendered concrete the likelihood of state action prejudicial to the interests of the union. It was the remoteness of the threat of state action that convinced the Court in *Oil Workers* to hold that case moot. In the case now before us, the state action is not at all contingent. Under the petitioners' view of the case, it is immediately and directly injurious to the corporate petitioners' economic positions. Where such state action or its imminence adversely affects the status of private parties, the courts should be available to render appropriate relief and judgments affecting the parties' rights and interests.

B. If we were to condition our review on the existence of an economic strike, this case most certainly would be of the type presenting an issue "capable of repetition, yet evading review." *Southern Pac. Terminal Co.* v. *ICC,* 219 U. S., at 515; *Grinnell Corp.* v. *Hackett,* 475 F. 2d 449 (CA1), cert. denied, 414 U. S. 858 and 879 (1973); *ITT Lamp Division* v. *Minter,* 435 F. 2d, at 991. To require the presence of an active and live labor dispute would tax the litigant too much by arbitrarily slighting claims of adverse injury from concrete governmental action (or the immediate threat thereof). It is sufficient, therefore, that the litigant show the existence of an immediate and definite gov-

ernmental action or policy that has adversely affected and continues to affect a present interest. Otherwise, a state policy affecting a collective-bargaining arrangement, except one involving a fine or other penalty, could be adjudicated only rarely, and the purposes of the Declaratory Judgment Act would be frustrated.

Certainly, the pregnant appellants in *Roe* v. *Wade, supra,* and in *Doe* v. *Bolton,* 410 U. S. 179 (1973), had long since outlasted their pregnancies by the time their cases reached this Court. Yet we had no difficulty in rejecting suggestions of mootness. 410 U. S., at 125 and 187. Similar and consistent results were reached in *Storer* v. *Brown,* 415 U. S. 724, 737 n. 8 (1974); *Rosario* v. *Rockefeller,* 410 U. S. 752, 756 n. 5 (1973); *Dunn* v. *Blumstein,* 405 U. S. 330, 333 n. 2 (1972); and *Moore* v. *Ogilvie,* 394 U. S. 814, 816 (1969), cases concerning various challenges to state election laws. The important ingredient in these cases was governmental action directly affecting, and continuing to affect, the behavior of citizens in our society.

The issues here are no different. Economic strikes are of comparatively short duration. There are exceptions, of course. See, for example, *Local 833, UAW* v. *NLRB,* 112 U. S. App. D. C. 107, 300 F. 2d 699, cert. denied *sub nom. Kohler Co.* v. *Local 833, UAW,* 370 U. S. 911 (1962). But the great majority of economic strikes do not last long enough for complete judicial review of the controversies they engender. U. S. Dept. of Labor, Bureau of Labor Statistics, Analysis of Work Stoppages 1971, Table A 3, p. 16 (1973). A strike that lasts six weeks, as this one did, may seem long, but its termination, like pregnancy at nine months and elections spaced at year-long or biennial intervals, should not preclude challenge to state policies that have had their impact and that continue in force, unabated and un-

reviewed. The judiciary must not close the door to the resolution of the important·questions these concrete disputes present.

The judgment of the Court of Appeals is reversed and the case is remanded for further proceedings on the merits of the controversy. *It is so ordered.*

MR. JUSTICE STEWART, with whom THE CHIEF JUSTICE, MR. JUSTICE POWELL, and MR. JUSTICE REHNQUIST join, dissenting.

· The Court today reverses the Court of Appeals and holds that this case is not moot, despite the fact that the underlying labor dispute that gave rise to the petitioners' claims ended even before the parties made their initial appearance in the District Court. I think this holding ignores the limitations placed upon the federal judiciary by Art. III of the Constitution and disregards the clear teachings of prior cases. Accordingly, I dissent.

This Court has repeatedly recognized that the inability of the federal judiciary "to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." *Liner v. Jafco, Inc.,* 375 U. S. 301, 306 n. 3. See also *North Carolina v. Rice,* 404 U. S. 244, 246; *Powell v. McCormack,* 395 U. S. 486, 496 n. 7; *Sibron v. New York,* 392 U. S. 40, 50 n. 8. Since Art. III courts are precluded from issuing advisory opinions, *Hayburn's Case,* 2 Dall. 409; *Muskrat v. United States,* 219 U. S. 346, it necessarily follows that they are impotent "to decide questions that cannot affect the rights of litigants in the case before them." *North Carolina v. Rice, supra,* at 246; *St. Pierre v. United States,* 319 U. S. 41, 42.[1]

---

[1] See generally Diamond, Federal Jurisdiction to Decide Moot Cases, 94 U. Pa. L. Rev. 125; Note, Mootness on Appeal in the

These broad constitutional principles, of course, provide no more than the starting point, since the decision as to whether any particular lawsuit is moot can be made only after analysis of the precise factual situation of the parties involved. But in my view our task in the present case is greatly simplified, for this Court has had several occasions within the past 20 years to apply the general principles of mootness to the specific facts of labor disputes closely analogous to the one at hand.

The first of these cases was *Harris* v. *Battle*, 348 U. S. 803, in which the issue was whether a Virginia statute that permitted the state Governor to order that "possession" be taken of a transit company whose employees were on strike was in conflict with the National Labor Relations Act. The underlying labor dispute was settled and the seizure terminated before the case came to trial, but the trial court nevertheless proceeded to decide the merits of the controversy, finding the statute constitutional. After the Virginia Supreme Court refused review, an appeal was taken to this Court. In a brief *per curiam* opinion, this Court held that the case was moot and ordered the appeal dismissed.

In *Oil Workers Unions* v. *Missouri*, 361 U. S. 363, we had occasion to explicate the holding of *Harris* v. *Battle* in the context of a challenge to Missouri's King-Thompson Act, which allowed the Governor on behalf of the State to take possession of and operate a privately owned public utility affected by a work stoppage. In that case, the underlying strike and seizure had terminated while the case was on appeal to the Supreme Court of Missouri. Nonetheless, that court considered the merits of the law-

Supreme Court, 83 Harv. L. Rev. 1672; Note, Mootness and Ripeness: The Postman Always Rings Twice, 65 Col. L. Rev. 867; Note, Cases Moot on Appeal: A Limit on the Judicial Power, 103 U. Pa. L. Rev. 772.

suit, holding the King-Thompson Act constitutional. We read *Harris* v. *Battle* as requiring that the case be held moot, since the termination of both the strike and the seizure left "no 'actual matters in controversy essential to the decision of the particular case' " then before us. 361 U. S., at 367, quoting from *United States* v. *Alaska S. S. Co.,* 253 U. S. 113, 116.

The constitutionality of the King-Thompson Act was again at issue in *Bus Employees* v. *Missouri,* 374 U. S. 74. The strike and seizure in that case were still in effect at the time of the decision of the Supreme Court of Missouri, but, after the appellants' jurisdictional statement was filed in this Court, the Governor of Missouri terminated the outstanding seizure order. Consequently, the appellees argued that the case had become moot, relying on *Harris* and *Oil Workers.* We rejected the contention, noting that in both those cases, the underlying labor dispute had been settled by the time the litigation reached this Court. In *Bus Employees,* by contrast, the strike was still unresolved, and the appellants were thus fully subject to the provisions of the King-Thompson Act. Hence, we concluded that *Harris* and *Oil Workers* did not control, and we proceeded to decide the merits of the case, holding the Missouri law to be in conflict with the National Labor Relations Act, and thus invalid under the Supremacy Clause.

I think it is clear that the facts of the case before us serve to bring it within the teaching of *Harris* and *Oil Workers,* and outside the ambit of *Bus Employees.* Here, as in *Harris* and *Oil Workers,* both the underlying work stoppage and the challenged governmental action— the providing of welfare benefits to the petitioners' employees—had ceased long before review was sought in this Court. Any view that a federal court might express on the merits of the petitioners' Supremacy Clause claims

would, therefore, amount to an advisory opinion, having no effect on any "actual matters in controversy." As we noted in *Oil Workers,* such an undertaking would ignore a "basic limitation upon the duty and function of the Court, and . . . disregard principles of judicial administration long established and repeatedly followed." 361 U. S., at 368.

The Court offers essentially two arguments aimed at distinguishing this case from *Harris* and *Oil Workers.* First, it says that the very existence of the New Jersey welfare programs constitutes a continuing burden on the petitioners' ability to engage in collective bargaining with the respondent union. Secondly, the Court says that the underlying controversy here is "capable of repetition, yet evading review," and thus comes within the rule of *Southern Pac. Terminal Co. v. ICC,* 219 U. S. 498, 515.

Similar arguments, however, were considered and rejected in both *Harris* and *Oil Workers.* In each of those cases it was argued that the *Southern Pacific* doctrine prevented a finding of mootness, and it was also argued that the case was not moot because of the continuing threat of state seizure of public utilities in future labor disputes. The Court's summary dismissal of the *Harris* appeal necessarily rejected both of these contentions, and we explicitly adhered to that holding in *Oil Workers:*

> "In [*Harris*] it was urged that the controversy was not moot because of the continuing threat of state seizure in future labor disputes. It was argued that the State's abandonment of alleged unconstitutional activity after its objective had been accomplished should not be permitted to forestall decision as to the validity of the statute under which the State had purported to act. It was contended that the situation was akin to cases like *Southern Pac. Terminal Co.* v. *Interstate Commerce Comm'n,* 219

U. S. 498, 514–516. In finding that the controversy was moot, the Court necessarily rejected all these contentions. 348 U. S. 803. Upon the authority of that decision the same contentions must be rejected in the present case. See also *Barker Co.* v. *Painters Union,* 281 U. S. 462; *Commercial Cable Co.* v. *Burleson,* 250 U. S. 360." 361 U. S., at 368–369 (footnotes omitted).

I find no reason to depart from this holding in the case before us. While it is not inconceivable that the petitioners' employees will once again strike and perhaps once again become eligible for future New Jersey welfare benefits, I find little to distinguish that hypothetical situation from the "speculative possibility of invocation of the King-Thompson Act in some future labor dispute" [2] that was present in *Oil Workers.* And, even if it could be assumed that the present controversy is "capable of repetition" within the meaning of the *Southern Pacific* test, I am less than confident that the issues presented can truly be characterized as "evading review." If nothing else, the *Bus Employees* case teaches that even the most confident predictions about the future unreviewability of specific legal controversies are often proved inaccurate. Indeed, several courts of appeals have had the opportunity to consider the precise Supremacy Clause issues now raised by the petitioners in the context of ongoing labor disputes.[3] Given that experience, I

---

[2] *Bus Employees* v. *Missouri,* 374 U. S. 74, 78.

[3] In *ITT Lamp Division* v. *Minter,* 435 F. 2d 989 (CA1), two cases were consolidated on appeal; one of them involved an ongoing strike. Similarly, the underlying labor dispute in *Russo* v. *Kirby,* 453 F. 2d 548 (CA2), was still in effect at the time of the Court of Appeals' decision, although the appellate court did not reach the employers' Supremacy Clause arguments, since it found that the District Court lacked jurisdiction to hear the suit, which

cannot conclude that it is permissible to resolve these important questions in a case where their resolution will have no direct effect on the parties to the litigation.

The argument that eligibility of strikers for future New Jersey welfare benefits might affect the "ongoing" process of collective bargaining fares no better in the light of the *Oil Workers* decision. The continued existence of the King-Thompson Act in *Oil Workers* arguably had a most significant effect on the employees' collective-bargaining ability, since it threatened to deprive them of their principal economic weapon, the capacity to strike. Yet the Court found the continuing threat of seizure in future labor disputes to be insufficient to save the *Oil Workers* case from mootness. No different weight should be accorded to the petitioners' argument that the possibility of strikers receiving welfare benefits will make future work stoppages less onerous for their employees.[4]

had been brought by strikers to *compel* the payment of welfare benefits.

[4] The Court characterizes the governmental action challenged in *Oil Workers* and *Harris* as more "remote" and "contingent" than the New Jersey policy at hand. For mootness purposes, I think that this is a distinction without a difference. For one thing, New Jersey does not automatically extend welfare benefits to striking workers; it merely makes them *eligible* to receive such benefits, provided that they meet all other appropriate criteria. Thus, for the challenged governmental action here to recur, at least two things must happen: the respondent union must again call a strike, and the workers must satisfy the standards of need that may then be set forth in the New Jersey welfare statutes. If the threat of seizure in *Oil Workers* was viewed as "contingent" in nature, no different conclusion can be reached here.

Moreover, as the Court concedes, *ante,* at 123 n. 7, the threat of seizure in *Oil Workers* involved "a far more severe form" of governmental interference in the collective-bargaining process than does the New Jersey policy of making strikers eligible for welfare benefits, since invocation of the Missouri statute served to cripple any strike

In short, I think that this case is completely controlled by *Harris* and *Oil Workers*. The doctrine of mootness is already a difficult and complex one, and I think that the Court today muddies the waters further by straining unnecessarily to distinguish and limit some of the few clear precedents available to us.

For these reasons I would affirm the judgment of the Court of Appeals.

---

completely. Thus, even if the governmental action involved in *Oil Workers* is viewed as more "contingent" than in the present case, I cannot understand how its effect on the collective-bargaining process can be characterized as less serious.