SUPER TIRE ENGINEERING CO. et al., Plaintiffs,

v.

Lloyd W. McCORKLE, Commissioner of the Department of Institutions and Agencies of the State of New Jersey, et al., Defendants-Appellees.

Civ. A. No. 853-71.

United States District Court, D. New Jersey.

April 29, 1976.

Gerard C. Smetana, Borovsky, Smetana, Ehrlich & Kronenberg, Washington, D. C., Herbert G. Keene, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., Edward C. Laird, Archer, Greiner & Read, Haddonfield, N. J., for plaintiff, Super Tire Engineering Co.

William F. Hyland, Atty. Gen. of N. J. by Stephen Skillman, Paul N. Watter, Trenton, N. J., for defendants, Lloyd W. McCorkle, Commissioner, Dept. of Institutions and

Agencies, and Irving J. Engelman, Director, Division of Public Welfare.

Louis C. Portella, Portella, Donovan & Favieri, Cherry Hill, N. J., for defendant, Fred L. Streng.

Martin F. McKernan, Jr., City Atty., Camden, N. J., for defendant, Juanita E. Dicks, former Welfare Director of the Municipal Welfare Department of the City of Camden.

Robert F. O'Brien, Tomar, Parks, Seliger, Simonoff & Adourian, Camden, N. J., for intervenor, Teamsters Local Union No. 676.

OPINION

GERRY, District Judge.

Pursuant to the regulations of the New Jersey Department of Institutions and Agencies,[1] workers who are engaged in law-ful labor disputes and who are otherwise qualified are eligible for public assistance through New Jersey public welfare pro-grams.[2] This action was filed on June 10, 1971 in this Court by two affiliated New Jersey corporations, Super Tire Engineer-ing Co. and Supercap Corporation, and their president and chief executive officer alleg-ing that the corporations' employees were striking and were receiving public assist-ance under these programs as administered by defendants, the New Jersey Commission-er of Institutions and Agencies, the Di-rector of the Division of Public Welfare, the Director of the Camden County Welfare Board, and the Director of the Municipal Welfare Department of the City of Cam-den.[3] Plaintiffs sought injunctive and de-claratory relief against such eligibility claiming that the payment of public assist-ance to strikers was contrary to New Jersey law, to the federal policy promulgated by

---

1. Regulation M.A. 1.006 (revised March, 1957) provides in part:

   "A. Citation of Statute and Constitution
   "Chapter 156, P.L.1947 (R.S. 44:8–108) defines reimbursable public assistance as 'as-sistance rendered to needy persons not other-wise provided for under the laws of this State, where such persons are willing to work but are unable to secure employment due either to physical disability or inability to find employment.'
   "The Constitution of New Jersey 1947, Arti-cle I, paragraph 19, guarantees that 'Persons in private employment shall have the right to organize and bargain collectively.'
   "B. Interpretation and Policy
   "It may be inferred from the quoted section of the statute that persons unwilling to work are ineligible for public assistance. How-ever, for purposes of public administration, the phrase 'unwilling to work' must be defined as objectively as possible.

   .   .   .   .   .   .

   ".  .  . The Constitutional guarantee of the 'right to organize and bargain collective-ly' implies the right of the individual to par-ticipate in a bona fide labor dispute as be-tween the employer and the collective bar-gaining unit by which the individual is repre-sented. Moreover, a 'strike,' when lawfully authorized and conducted, is recognized as an inherent and lawful element of the proc-ess of bargaining collectively and of resolving labor disputes. Accordingly, when an indi-vidual is participating in a lawful 'strike,' he may not be considered merely because of such participation, as refusing to work with-out just cause.
   "C. Regulations
   "Based on the foregoing statement of inter-pretation and policy, the following regula-tions are established:

   .   .   .   .

   "4. No individual shall be presumed to be unwilling to work, or to be wrongfully re-fusing to accept suitable employment, merely because he is participating in a lawful labor dispute.
   "5. An individual who is participating in a lawful labor dispute, and who is needy, has the same right to apply for public assistance, for himself and his dependents, as any other individual who is needy.
   "6. In the case of an applicant for public assistance who is participating in a lawful labor dispute, there shall be an investigation of need and other conditions of eligibility, and an evaluation of income and resources, in the same way and to the same extent as in all other cases. In such instances, 'strike benefits' or other payments available to the individual from the labor union or other source, shall be considered a resource and shall be determined and accounted for."

2. General Public Assistance Law, N.J.S.A. § 44:8–107 *et seq.* and Assistance to Families of the Working Poor, N.J.S.A. § 44:13–1 *et seq.*

3. The collective bargaining representative of Super Tire's employees, Teamsters Local Union No. 676, was granted leave to intervene as a defendant.

the Social Security Act of 1935,[4] and to the federal labor policy as provided for in the Labor Management Relations Act of 1947.[5] Before the case was tried, the labor dispute was settled, and the strike ended. The District Court dismissed the complaint pursuant to Rule 12(b)(6), F.R.C.P., ruling that the appropriate forum for plaintiff's claim was Congress and that the challenged regulations did not violate the Supremacy Clause. On appeal to the United States Court of Appeals for the Third Circuit, the action was remanded with instructions to vacate and dismiss the complaint as moot. 469 F.2d 911, 922 (3d Cir. 1972). The United States Supreme Court reversed and remanded for an adjudication on the merits of the controversy holding that declaratory relief was appropriate since the challenged state policies were ongoing and continued to affect the parties' collective bargaining relationship. *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 124–127, 94 S.Ct. 1694, 1699–1701, 40 L.Ed.2d 1 (1974). Cross motions for summary judgment have subsequently been filed by plaintiffs and the state defendants.[6] The sole legal issue for resolution by this Court is whether the New Jersey welfare regulation which provides that "no individual shall be presumed to be unwilling to work, or to be wrongfully refusing to accept suitable employment, merely because he is participating in a lawful labor dispute" is consistent with the applicable provisions of federal law.[7]

Both parties argue that the federal welfare policy supports their respective positions on the issue of whether federal law prohibits the payment of public assistance to strikers and their families. Since Congress has failed to explicitly delineate its position in this regard, a review of the legislative history of the Social Security Act of 1935 and its amendments, congressional action in related areas, and the relationship of the New Jersey regulations at issue to these developments is mandated.

■ One of the three major categorical public assistance programs established by the Social Security Act is Aid to Families with Dependent Children which is a joint federal-state program designed for needy children who have been "deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent" and who are living with one of a specified group of relatives. 42 U.S.C. § 606(a). "[P]rotection of such children is the paramount goal of AFDC." *King v. Smith*, 392 U.S. 309, 325, 88 S.Ct. 2128, 2137, 20 L.Ed.2d 1118, 1130 (1968). Although the initial AFDC program limited eligibility to needy children, in 1950 Congress authorized the payment of benefits to also meet the needs of the caretaker relatives of these dependent children. 64 Stat. 551 (1950), (42 U.S.C. § 606(b)(1)). In order for either the dependent child or the adult caretaker relative to qualify for assistance, the need requirements set by the state must be met and the dependent child must be deprived of parental support by virtue of death, disability, or absence from the home. *See generally, King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). These

---

4. 42 U.S.C. § 601 *et seq.*

5. 29 U.S.C. § 141 *et seq.*

6. The defendant union has filed a memorandum in opposition to plaintiff's motion for summary judgment, contending that an evidentiary hearing is mandated to determine the effect, if any, the payment of welfare benefits to strikers has upon the collective bargaining process.

7. Although no allegation was made within their complaint, plaintiffs argue that the state regulation is violative of the equal protection clause of the Fourteenth Amendment in that needy strikers involved in collective bargaining disputes are eligible while those striking due to political and other fundamental beliefs are not. This Court finds that it is inappropriate to adjudicate the merits of this contention within the context of this controversy. There is no basis in fact that plaintiffs have been so injured nor that such a determination has ever been made by the state welfare officials. Furthermore, the New Jersey state courts have not had an opportunity to decide whether such a practice would be in conformity with state law.

conditions to eligibility have been established by Congress, and a state electing to participate in this program is free to set its own standard of need and level of benefits, but it is not free to modify or supplement these eligibility requirements. *Townsend v. Swank,* 404 U.S. 282, 286, 92 S.Ct. 502, 505, 30 L.Ed.2d 448, 452–53 (1971); *Carleson v. Remillard,* 406 U.S. 598, 600, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972).

■ The receipt of public assistance by families which included individuals who were on strike has been a practice in the United States throughout this century.[8] Under the Federal Emergency Relief Act of 1933, 73d Cong., Sess. I, Ch. 28–30, the predecessor of the categorical assistance provisions of the Social Security Act, benefits were paid to strikers. See also Bureau of Social Science Research, Inc., *Legislative History of the Aid to Dependent Children Program,* 12–16 (1970). In 1933, Congress provided striking workers of the railroad industry with benefits under specified conditions pursuant to the Railroad Employment Insurance Act, 45 U.S.C. §§ 351 et seq., 354(a–2)(iii). Striker eligibility under the Unemployment Compensation Act of 1935, 42 U.S.C. § 501 et seq., was deferred by Congress to each state. *See* 79 Cong. Rec. 5782, 9284 (1935) (Remarks of Congressmen Cooper and Wagner), Under the Food Stamp Act, 7 U.S.C. § 2011, *et seq.,* which is a coordinated program with AFDC,[9] otherwise eligible strikers are qualified to participate. An effort in 1970 to exclude their participation was rejected. 7 U.S.C. § 2014(c). Similarly, congressional

attempts to prohibit AFDC benefits to eligible strikers have been defeated. In 1972, the administration introduced legislative proposals which contained an explicit provision to deny strikers benefits under the AFDC program. Senate Report No. 92–1230, 92d Cong., 2d Sess. 108, 472–73 (1972). This modification was debated on the Senate floor but deleted prior to the vote. 118 Cong.Rec. 16815, 17049–17052. Likewise, three bills which sought to amend the Social Security Act in order to proscribe AFDC–U benefits for strikers were introduced in the House of Representatives in 1973, but they were not passed. H.R. 9422, 9748, 9903, 93d Cong., 1st Sess. (1973).

Although Congress has amended the Social Security Act numerous times since 1935,[10] and has reconsidered and modified the original conditions to AFDC eligibility,[11] it has not excluded strikers and their families from the program. Plaintiffs argue that these subsequent amendments to AFDC eligibility implicitly excluded striking workers by contending that a person engaged in an economic strike has terminated his employment without good cause as is mandated by 42 U.S.C. §§ 602(a)(19)(F), 607(b)(1)(B), and is not an unemployed individual within the context of the Social Security Act. It is difficult for this Court to conclude that Congress, fully aware of the fact that strikers were receiving welfare benefits under the Act, intended by its silence on the issue to terminate that practice. Even so, these amendments do not implicitly exclude strikers, otherwise qualified, from receiving welfare benefits.

---

**8.** The first litigation over such payments was in 1904, *City of Spring Valley v. County Bureau,* 115 Ill.App. 545.

**9.** 7 C.F.R. § 271.3.

**10.** See 53 Stat. 1379 (1939), 64 Stat. 549 (1950), 70 Stat. 848 (1956), 72 Stat. 1048 (1958), 75 Stat. 75 (1961), 76 Stat. 185 (1962), 79 Stat. 414 (1965), 81 Stat. 877 (1968), 85 Stat. 802 (1971), 86 Stat. 1485 (1972).

**11.** 75 Stat. 75 (1961) extended A.F.D.C. benefits to two-parent families in which the father was unemployed. The revised statute reads that "the term 'dependent child' shall . . . include a needy child . . . who has been deprived of parental support or care by reason of the unemployment (as determined in accordance with standards prescribed by the Secretary) of his father . . ." 42 U.S.C. § 607(a). This program is not obligatory upon the states.

81 Stat. 877 (1968) required A.F.D.C. recipients to participate in work training programs and to seek employment.

The good cause requirement within the Act speaks to an employable individual's rejection of an offer of employment or training. Nothing in the New Jersey regulations relieves a striker of any of the eligibility requirements which must be met by others. A striker must register for work and accept an offer of employment other than the job at issue in the strike. 42 U.S.C. § 602(a)(8)(C)(ii). See also Super Tire Engineering Co. v. McCorkle, 416 U.S. at 132, n. 4, 94 S.Ct. at 1703, 40 L.Ed.2d at 14 (Stewart, J., dissenting); Francis v. Davidson, 340 F.Supp. 351, 366–67 (D.Md. 1972), aff'd 409 U.S. 904, 93 S.Ct. 223, 34 L.Ed.2d 168 (1972). The New Jersey regulation does not declare than an economic strike is good cause for terminating employment nor that it is prohibited conduct sanctioned by ineligibility for public assistance. Rather, Regulation MA 1.006(c), as explained in its policy statement, simply removes any presumption of ineligibility of an individual due to the exercise of his federally protected right to strike.[12] See also Strat-O-Seal Mfg. v. Scott, 72 Ill.App.2d 480, 218 N.E.2d 227 (1966). As the court in ITT v. Minter, 435 F.2d 989, 994 (1st Cir. 1970), cert. denied 402 U.S. 933, 91 S.Ct. 1526, 28 L.Ed.2d 868 (1971), reh. denied 404 U.S. 874, 92 S.Ct. 27, 30 L.Ed.2d 120 (1971), observed, it is "no less circular or more persuasive" to equate such refusals to work with fault and the absence of good cause as it is to assume that the exercise of one's right to strike constitutes good cause. As the Senate Finance Committee's Report makes clear,[13] the issue of good cause is a decision left to the states, and New Jersey has determined to treat otherwise eligible strikers as all other eligible citizens, refusing to discriminate against a needy person solely on the genesis of that need. State ex rel. Executive Committee International Union v. Montana State Dept. of Public Welfare, 136 Mont. 283, 347 P.2d 727, 738 (1959). At a minimum, contrary to plaintiff's assertions, the federal provisions prohibiting welfare payments to persons who have terminated or refused employment without good cause do not conclusively and automatically exclude strikers from receipt of such benefits.

Additionally, plaintiffs argue that congressional intent to exclude strikers from receiving benefits under the Social Security Act is evidenced by the concept of unemployment introduced into the Act with the creation of the AFDC–U program.[14] Pointing to the purpose of the AFDC–U program as a means of permitting the involuntarily unemployed who meet the other eligibility requirements to participate in the AFDC program,[15] plaintiffs contend that strikers were thereby excluded from receiving such assistance. Whether Congress has defined unemployment accordingly is not clear as is evidenced by the series of cases within the Fourth Circuit as to the meaning of unemployment and to the issue of whether a national definition was congressionally mandated. In Francis v. Davidson, 379 F.Supp. 78, 81–82 (D.Md.1974), aff'd sub. nom., Francis v. Chamber of Commerce, 529 F.2d 515 (4th Cir., 1975), the court determined that the Secretary of Health, Education and Welfare was directed to promulgate a national definition of unemployment to which participating states would be required to adhere in administrating their programs. Under the regulation originally issued by HEW, 45 CFR § 233.100(a)(1)(i), the Secretary required each participating

---

12. This observation is not to insinuate that a case-by-case evaluation of striking disputes is appropriate. See General Electric Co. v. Callahan, 294 F.2d 60 (1st Cir. 1961), appeal dismissed 369 U.S. 832, 82 S.Ct. 851, 7 L.Ed.2d 840 (1962), in which an activity compelling a state administrator to take sides in a labor dispute was determined to be impermissible.

13. Senate Committee on Finance, Rep.No.165, 87th Cong., 1st Sess., p. 3 (1961); U.S.Code Cong. and Admin.News, pp. 1716, 1718.

14. It should be noted that New Jersey withdrew from AFDC–U in 1971.

15. The Senate Finance Committee Report indicates that the program's purpose is "to assist children who are in need because of unemployment of a parent" as is done with children in need because of a parent's death, absence or incapacity. U.S. Code Congressional & Administrative News, 87th Cong., 1st Sess., p. 1716 (1961).

state to include all fathers, who were otherwise qualified, who were employed less than a given number of hours.[16] Therefore, those persons who were out of work because of a labor dispute and who had met all other eligibility criteria were entitled to AFDC–U assistance if their state had chosen to participate. *Francis v. Davidson*, 340 F.Supp. 351 (D.Md.1972), *aff'd* 409 U.S. 904, 93 S.Ct. 223, 34 L.Ed.2d 168 (1972).[17] Neither the language of the amendment nor its legislative history indicate a congressional intent to define unemployment as excluding those out of work due to a labor dispute.[18] Rather, Congress directed the Secretary of HEW to determine the criteria which would render people unemployed for purposes of the AFDC–U program. 42 U.S.C. § 607(a); *Francis v. Davidson*, 379 F.Supp. at 81–82. The Secretary has acted accordingly, and the existing valid regulation does not preclude those out of work because of a labor dispute.

The Social Security Act has not explicitly addressed itself to strikers and their eligibility for public assistance under the Act. However, strikers have consistently received benefits under these and similar federal welfare legislation, and New Jersey has accordingly permitted such payments.[19]

Specific proposals which would have terminated these payments have been repeatedly rejected by Congress, and an examination of eligibility amendments to the Act has not revealed any indirect prohibition of them. Therefore, this Court deems it inappropriate to assume a legislative function and cannot conclude that the New Jersey regulations at issue are inconsistent with the federal welfare policy.

However, plaintiffs urge this Court to impute such congressional intent concerning the payment of welfare benefits to strikers from the Labor Management Relations Act, 29 U.S.C. § 141 *et seq.* Plaintiffs do not refer to any specific provision of the N.L.R.A. prohibiting striker eligibility but contend that such eligibility alters the relative economic strength of the parties thereby frustrating the national labor policy of free collective bargaining.[20] It is difficult for this Court to imbue congressional silence in both the Social Security Act and the N.L.R.A. with such significance. If in fact the national labor policy and the national welfare policy are irreconcilable, we would doubt, as did the First Circuit in *ITT v. Minter, supra* at 994, that Congress would be unaware of such a conflict and would have failed to address itself to the problem.

**16.** 45 C.F.R. § 233.100(a), as promulgated in 1969, provided in part:

§ 233.100 Dependent children of unemployed fathers.

(a) Requirements for State Plans. If a State wishes to provide AFDC for children of unemployed fathers, the State plan under Title IV—Part A of the Social Security Act must, except as specified in paragraph (b) of this section:
(1) Include a definition of an unemployed father
(i) Which shall include any father who is employed less than 30 hours a week, or less than three-fourths of the number of hours considered by the industry to be full time for the job, whichever is less, . . .

**17.** Accordingly, the Maryland regulation denying AFDC–U benefits to those unemployed because of a labor dispute was held invalid as inconsistent with federal regulatory requirements. *Francis v. Davidson, supra* at 368.

**18.** In fact, Congressman Mill's response to this question indicates congressional awareness

that the Amendment's terminology would not exclude those unemployed due to a labor dispute. 107 Cong.Rec. 3766 (1961).

**19.** Under 42 U.S.C. § 1316, the Secretary of HEW is charged with the responsibility of periodically reviewing state policies to make a determination as to whether the plan conforms with the provisions and policies of the Social Security Act.

**20.** The extent to which the payment of *unemployment* compensation to strikers may or may not conflict with the policy of the N.L.R.A. is clearly distinguishable from the issue here. As noted by the Court in *Grinnell Corp. v. Hackett,* 475 F.2d 449, 459 (1st Cir. 1973), *cert. denied* 414 U.S. 858, 94 S.Ct. 164, 38 L.Ed.2d 108 (1973), the state interests in and the funding mechanisms of unemployment compensation and welfare assistance are not the same, requiring a separate consideration of their reconcilability with federal labor policy.

See also *Almacs, Inc. v. Hackett*, 312 F.Supp. 964, 968 (D.R.I.1970). This conclusion is particularly compelling in light of Congress' refusal to prohibit such payments by amending the major public assistance programs of the Social Security Act.

In fact, a review of the only congressional action in this regard, the Food Stamp Act Amendment of 1970, would infer a contrary conclusion. In 1970, Congress rejected proposals to disqualify strikers from the Food Stamp Program and amended the statute to expressly approve their eligibility.[21] The reason given by the House Committee on Agriculture was their determination not "to take sides in labor disputes." [22] Congress viewed the maintenance of government neutrality in labor disputes contingent upon the refusal of government to treat otherwise eligible strikers differently from non-strikers in securing public assistance. At the very least, it may be concluded that Congress has not perceived these subsistence payments as an infringement upon the collective bargaining process. In light of this congressional perception of the interaction of the federal welfare system with that of the national labor policy, this Court cannot conclude that New Jersey's refusal to disqualify strikers from their assistance programs is a frustration of the federal labor law's full effectiveness and thereby in violation of the Supremacy Clause of the Constitution.

Having concluded that the New Jersey regulations are not inconsistent with federal welfare and labor policies, an evidentiary hearing is not required, and the state de-

---

**21.** 7 U.S.C. § 2014(c) provides that the "refusal to work at a plant or site subject to a strike or a lockout for the duration of such strike or lockout shall not be deemed to be a refusal to accept employment."

**22.** The House Committee on Agriculture reported that

The committee debated at length the question of striker participation in the Food Stamp Program; it rejected a provision which would have automatically made strikers ineligible for food stamps. In lieu of such a provision the committee adopted language which clearly states that no person (neither a

fendants' motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied.

Counsel are directed to submit an appropriate order.

striker nor a nonstriker) need accept employment or training at a struck plant or site. The committee does not wish to take sides in labor disputes and does not believe this bill is the proper place to solve labor-management problems. The Secretary, through regulation, is free to establish whatever requirements he deems appropriate as to the method and time for strikers to register for employment or training at facilities not subject to a strike.

House Rep.No.91–1402, 91st Cong., 2d Sess., p. 11 (1970), U.S.Code Cong. & Admin.News 1970, pp. 6025, 6035.