**DIVISION 580, AMALGAMATED TRANSIT UNION, AFL–CIO, Appellant,**

v.

**CENTRAL NEW YORK REGIONAL TRANSPORTATION AUTHORITY et al., Appellees.**

**No. 639, Docket 77–7546.**

United States Court of Appeals, Second Circuit.

Argued Feb. 16, 1978.

Decided June 7, 1978.

Jules L. Smith, Syracuse, N. Y. (Blitman & King, Bernard T. King, James R. La-Vaute, Syracuse, N. Y., and Earle W. Putnam, Gen. Counsel, Amalgamated Transit Union, Washington, D. C., on the brief), for appellant.

Joseph S. Kaufman, Baltimore, Md. (Melnicove, Kaufman & Weiner, P. A., D. Christopher Ohly, Baltimore, Md., Axenfeld, Webb, Marshall, Bersani & Scolaro and Barry M. Shulman, Syracuse, N. Y., on the brief), for appellees.

Before LUMBARD, TIMBERS and GURFEIN, Circuit Judges.

LUMBARD, Circuit Judge:

This appeal from an order of the Northern District of New York, Port, J., raises the question what is the proper forum for determining when section 13(c) of the Urban Mass Transportation Act of 1964 ["UMTA"], 49 U.S.C. § 1609(c), requires that affected employers and unions agree to compulsory interest arbitration of the terms of a new collective bargaining agreement. Judge Port dismissed the suit of Division 580 of the Amalgamated Transit Union ["the Union"] seeking an order compelling the Central New York Regional Transportation Authority ["the Authority"] to engage in such arbitration, holding that a federal court lacked the jurisdiction to entertain such a suit. Because the parties, since oral argument of the appeal from that order, have agreed on the terms of a collective bargaining agreement for the period of November 1, 1976, through November 1, 1978, and have executed that agreement, we rule that the dispute is moot, and we vacate and remand to the district court with instructions to dismiss as moot.[1]

I

In passing UMTA, Congress was primarily interested in assisting in the development and improvement of urban mass transportation facilities. See H.Rep.No.204, 88th Cong., 2d sess. 2569 (1963), U.S.Code Cong. & Admin.News 1964, p. 2569. UMTA provided that state or local governmental units could apply for and receive federal grants to be used for the purchase of privately owned transit facilities. Congress was also concerned, however, to ensure that the employees of the purchased companies not lose their collective bargaining rights by virtue of having become public employees.[2] Ac-

---

1. This opinion constitutes our ruling on the Authority's Motion to Dismiss the appeal. We believe it more appropriate to remand for dismissal. See 13 C. Wright & A. Miller, Federal Practice and Procedure § 3533, at 293–94.

2. Such an outcome had apparently been seen only recently in Dade County, Florida. See Hearings on S. 6 Before the Subcomm. on Housing of the Senate Comm. on Banking and Currency, 88th Cong., 1st sess. 314, 319, 325 (1963).

cordingly, section 13(c) was adopted, making it a condition of grants under UMTA that the public employer have entered into an agreement ["the 13(c) agreement"] with representatives of the employees of the purchased company, satisfactory to the Secretary of Labor, which guaranteed the preservation of all existing collective bargaining rights of those employees. *See* 88 Cong. Rec. 14,937 (daily ed. June 30, 1964) (analysis of UMTA by Sen. Morse). The present dispute between the parties concerns just such a 13(c) agreement.

The Authority was created by New York in 1970 to take advantage of the opportunities afforded by UMTA to purchase private transit companies.[3] Since then, the Authority has received some $13 million in UMTA grants; it has also entered into 13(c) agreements with the Union in connection with each application for such a grant. The agreement that forms the basis of the instant appeal was entered into on March 11, 1975. It included an agreement by the Authority and the Union to submit to interest arbitration

> any labor dispute where collective bargaining does not result in agreement . . . . The term "labor dispute" shall be broadly construed and shall include any controversy concerning . . . the making or maintenance of collective bargaining agreements [and] the terms to be included in such agreements . . .

The grant contract between the United States and the Authority incorporated this 13(c) agreement, with its provision for compulsory interest arbitration of the terms of a new collective bargaining agreement; the existing collective bargaining agreement under which the employees belonging to the Union were working provided for arbitration of some disputes, but *not* of the terms of a new collective bargaining agreement should the parties be otherwise unable to come to terms.[4]

When the existing collective bargaining agreement between the parties expired on November 1, 1976, the parties were at an impasse with respect to a new agreement. The Union sought to invoke the arbitration provision of the 13(c) agreement, but the Authority declined to go to arbitration, noting that the expired collective bargaining agreement had not required arbitration, and relying on section 209 of New York's Taylor Law, N.Y. Civil Service Law § 209, to provide an impasse-breaking procedure.[5]

The Union filed suit in the Northern District, alleging that UMTA required that the provisions of the 13(c) agreement, as incorporated into the grant contract, take precedence over the terms of the prior collective bargaining agreement, and that compulsory arbitration was thus part of the Union's contract.[6] The Union's motion for a preliminary injunction was denied, and we affirmed that denial; *Division 580, Amalgamated Transit Union v. Central New York Regional Transp. Authority*, 556 F.2d 659 (2d Cir. 1977). Then, on October 19, 1977, Judge Port dismissed the suit orally for lack of subject matter jurisdiction.[7]

3. *See* N.Y.Pub.Auth.Law §§ 1323–38 (McKinney's 1977–78 Supp.).

4. A provision for such arbitration had appeared in some previous Union contracts, but had been removed at the insistence of the Union.

5. The Taylor Law, or the Public Employees' Fair Employment Act, N.Y. Civil Service Law §§ 200–14 (McKinney's 1973), governs the representational and bargaining rights of New York's public employees.

6. The Union also contends that UMTA itself requires compulsory arbitration; it asserts that such arbitration is mandated at least as a substitute for the existing rights of employees

who, in becoming public employees, lose their right to strike. *See* N.Y. Civil Service Law § 210 (McKinney's 1973).

7. Judge Port also dismissed that aspect of the Union's claim brought under 42 U.S.C. § 1983 (1970) and 28 U.S.C. § 1343 (1970). We need, of course, express no opinion as to his ruling on this ground; we note, however, that the scope of 28 U.S.C. § 1343 is identical to that of its substantive counterpart, 42 U.S.C. § 1983, despite the minor difference in language. *See, e. g., Lynch v. Household Finance Corp.*, 405 U.S. 538, 543–44 n. 7, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972).

The appeal from this order was argued on February 16, 1978. On April 24, we were notified by counsel for the Union that the parties had reached oral agreement on terms of a collective bargaining agreement for the period through November 1, 1978; on April 26, the same counsel confirmed to us that the parties had, in fact, executed such an agreement. One day later, counsel for the Authority filed a motion to dismiss the appeal on the ground of mootness. The Union filed its opposition to the motion on May 8.

## II

■ When, as here, the conduct of some governmental unit is challenged, and the conduct ceases to effect the challenger before his claim has been determined, then one set of factors on which the question of mootness may turn concerns whether the government action is "capable of repetition, yet evading review." *See, e. g., First National Bank v. Bellotti,* —— U.S. ——, ——, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). We rule that no exception to mootness has been established here under that standard.

■ The requirements for such an exception are: 1) that the challenged action have been in its duration too short to be fully litigated prior to its cessation or expiration; and 2) that there be a reasonable expectation that the same complaining party will be subjected to the same action again. *Id.* While the challenged action here—the Authority's refusal to arbitrate—is certainly capable of repetition in a way in which the government action in *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), was not, still it is far from obvious that the Union will be subjected to the same action again. *See* Part III *infra.*

More compelling in this context is the fact that the question herein is not necessarily one evading review. Perhaps the archetypal example of such a claim was that in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973): a baby must be born in nine months, more or less. Similarly, in *Bellotti, supra,* it was clear that an election would always have to be held within a certain—and fairly short—period after a referendum had been announced. There are not similar grounds for believing that the union and employer in an UMTA § 13(c) dispute will always be able to agree on terms of a new collective bargaining agreement before the § 13(c) question can be litigated, decided and reviewed. Indeed, it took the parties here some two months from the time the appeal was argued to reach agreement; other parties might well be more stubborn, particularly if, as the Union asserts, the question whether the Taylor Law or interest arbitration is the appropriate method of breaking an impasse is a highly emotion-charged issue. Even should the issue arise again between these same parties, there is a distinct possibility that their continued disagreement would be enduring enough to permit review the next time around.

## III

We also reject a second possible exception to a finding of mootness. This exception arises from the case of *Super Tire Engineering Co. v. McCorckle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), which created a doctrine, apparently peculiar to labor questions, that governs the determination of mootness when parties agree on a new contract during the pendency of a suit. In *Super Tire,* New Jersey had a practice of granting public assistance benefits to strikers, who became automatically entitled to the benefits in the case of a work stoppage. This practice was challenged as unconstitutional by employers. Though the parties had already settled the strike that had occasioned the litigation, the Court held that the challenged government activity, "by its continuing and brooding presence," *id.* at 122, 94 S.Ct. at 1698, cast a pall on the collective bargaining relationship, and had a substantial adverse effect on the parties' interests. Accordingly, the case was held not to be moot.

To some extent, the factors that were present in *Super Tire* are also present here; the § 13(c) question undoubtedly "affects every existing collective-bargaining agree-

ment, and is a factor lurking in the background of every incipient labor contract," *id.* at 124, 94 S.Ct. at 1699. Nonetheless, we note that the Court was careful to distinguish cases such as *Harris v. Battle*, 348 U.S. 803, 75 S.Ct. 34, 99 L.Ed. 634 (1954), in which the action challenged would not recur unless 1) there were another labor-management disagreement, and 2) the government chose, *in its discretion* (not automatically, as in *Super Tire*), to apply the challenged policy. "The question [in such a case is] posed in a situation where the threat of governmental action [is] two steps removed from reality." 416 U.S. at 123, 94 S.Ct. at 1698.

The instant case is closer to *Harris* than to *Super Tire*. The § 13(c) question will not arise again between these parties unless 1) the parties fail again to agree on terms of a new contract, and 2) the Authority refuses again to go to interest arbitration. There is not the same inevitability of recurrence as in *Super Tire*; since inevitability was a crucial factor in that case, it is preferable not to decide the instant case in its present posture.

Our gloss on the *Super Tire* doctrine, *Japan Air Lines Co. v. International Association of Machinists*, 538 F.2d 46 (2d Cir. 1976), makes even plainer the extent to which the doctrine is distinguishable. The issue between the parties there that was mooted by agreement was whether JAL would continue to deprive its union employees of work by subcontracting out certain tasks. We held, *id.* at 51, that since the point was a substantive one that would have to be settled anew in the parties' next collective bargaining agreement, it seriously imperilled the public interest in the uninterrupted flow of commerce, and had not been mooted.

In *JAL*, if the parties maintained their positions on the disputed issue, then the question would necessarily reach litigation the next time they had to negotiate a new contract. In the instant case, the kind of issue involved is different. The question

whether UMTA requires interest arbitration over a new collective bargaining agreement whenever the 13(c) agreement so provides (and, *a fortiori*, the question which court should decide that) is not the subject of a substantive contractual dispute between the parties. If they agree on all substantive questions in their next round of negotiations, then—even if they maintain their present positions on the issue at bar—the issue will not arise, nor will the parties even get into litigation. We decline to assume that the parties will be unable to come to terms on a new contract; the instant question is, in its current context, moot.

## IV

Underlying any decision as to mootness, of course, is the article III requirement of a "case or controversy." The question when a mootness issue is of constitutional dimensions, and when merely prudential, is not an easy one to answer. *See, e. g.*, 13 C. Wright & A. Miller, Federal Practice and Procedure § 3533, at 264–70. One aspect of the article III requirement is that there be sufficient genuine adversariness between the parties to guarantee the effective presentation of arguments. Here, of course, since the parties had already submitted their briefs and made their arguments before the putatively mooting event, there is no real doubt as to the effective presentation of both sides of the issue. But, as the Supreme Court has emphasized, that alone does not suffice to preclude mootness:

> As a practical matter, there can be no doubt that there is a spirited dispute between the parties . . . . But purely practical considerations have never been thought to be controlling on the issue of mootness in this Court. . . . [W]e are limited by the case-or-controversy requirement of Art. III to adjudication of actual disputes between adverse parties.

*Richardson v. Ramirez*, 418 U.S. 24, 35–36, 94 S.Ct. 2655, 2661–2662, 41 L.Ed.2d 551 (1974).[8]

What is paramount in the present situation is our responsibility to avoid issuing

---

8. One of our opinions also suggests that spirited advocacy alone does not constitute the req-

uisite "concrete adversariness." In *Meyers v. J St. Connecting R.R.*, 288 F.2d 356, 359 (2d Cir.

what would be essentially an advisory opinion. *See North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971). In this case, we believe that to decide the issue between the parties would be in effect to provide an advisory opinion. The issue is, without question, a thorny one—witness opinions from district courts in several circuits, going both ways.[9]

From all the considerations we have discussed, we conclude that we should not decide the issue until a case arises in which the outcome will be decisive for the parties in an actual, current dispute. Accordingly, we vacate and remand the instant case to the district court with instructions to dismiss it as moot.

See also D.C., 437 F.Supp. 60.

1961), we spoke of "the parties' self interest . . . impel[ling] them to press every argument at their command and thereby help the court reach the right result." Nonetheless, we did not rest our decision on this guarantee of effective advocacy alone. Rather, we noted that the issue between the parties—the validity of an injunction barring abandonment of a line pending ICC review—would infallibly come before the court despite the fact that the line had since been abandoned, because a bond remained in effect covering the railroad's loss should the injunction be ruled to have been improper. Since a suit on the bond would inevitably follow a dismissal of the appeal from the injunction, the same issue between the same parties would necessarily have to be decided, and the case was not moot. *Id.*

9. Compare, e. g., *Division 1285, Amal. Transit Union v. Jackson Transit Auth.*, No. C–76–104–E (W.D.Tenn. Feb. 23, 1978), *and Division 714, Amal. Transit Union v. Greater Portland Transit Dist.*, Civ.No. 77–54–SD (D.Me. Jan. 11, 1978) (oral ruling) (no federal jurisdiction), *with e. g., Division 1287, Amal. Transit Union v. Kansas City Area Transp. Auth.*, No. 77–0840–CV–W–1 (W.D.Mo. Feb. 28, 1978), *and Division 519, Amal. Transit Union v. LaCrosse Mun. Transit Utility*, No. 77–C–292 (W.D.Wis. Jan. 27, 1978) (federal jurisdiction).