569 F.2d 742
 The UNION NATIONAL BANK OF PITTSBURGH, PITTSBURGH,
PENNSYLVANIA, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Jack Riley on behalf of himself and similarly situated
agents, Fleet Owners and Owner-Operators, Intervenors.
 No. 77-1492.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 20, 1977.
Decided Dec. 13, 1977.
 
 M. Bruce McCullough, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for petitioner; William A. Chesnutt, McNees, Wallace & Nurick, Washington, D. C., of counsel.
 John J. McCarthy, Jr., I. C. C., Washington, D. C., for respondent, I. C. C.
 J. Michael Farrell, O'Connor, Farrell & Daly, Washington, D. C., for intervenors.
 John H. Shenefield, Acting Asst. Atty. Gen., Barry Grossman, Frederick Freilicher, Attys., Dept. of Justice, Washington, D. C., Mark L. Evans, Gen. Counsel, Charles H. White, Jr., Associate Gen. Counsel, for respondents.
 Before ADAMS and GARTH, Circuit Judges, and LACEY,* District Judge.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 In this proceeding, Union National Bank of Pittsburgh (Bank) challenges certain action taken by the Interstate Commerce Commission (ICC). Specifically, the Bank contests the failure of the ICC to approve temporary operating authority under 49 U.S.C. § 310a(b)[1] in connection with the transfer of certain carrier certificates. Because it appears that the ICC exceeded its statutory authority, we remand that issue to the ICC for further consideration.
 
 I.
 
 2
 In July, 1975, the Bank authorized the issuance of a letter of credit in the amount of $550,000 on behalf of Harry and Adele Schreiber. The Schreibers used the letter in partial payment for the acquisition of stock of Sullivan Lines, Inc., a trucking carrier line. The bank in turn secured its letter to credit and all future advances made to the Schreibers or to Sullivan Lines by perfecting a security interest in the certificates of public convenience and necessity issued by the ICC (the Sullivan certificates), and by filing a notice of its interest with the ICC.
 
 
 3
 Later that year, the Bank learned of a contemplated government investigation into Sullivan Lines, Inc. To date, however, despite certain ICC orders which indicate an ongoing investigation, the Bank has yet to be apprised of any formal proceedings initiated against Sullivan Lines.[2]
 
 
 4
 From October through December of 1976, the Bank was made aware that the Schreibers had defaulted on certain of their outstanding debts. During the week of January 3, 1977, it became further apparent that, due to a cash shortage, the operations of Sullivan Lines could not continue. Operations ceased soon thereafter, and have not been resumed to date.
 
 
 5
 By the time that the operations of Sullivan Lines were discontinued, the Bank had advanced an additional.$2.1 million to Sullivan Lines beyond the initial letter of credit. To protect its financial investment in Sullivan Lines, the Bank entered into a January 12th agreement of sale and purchase, whereby the Bank, Sullivan Lines, and others, as sellers, would transfer the Sullivan operating rights to purchaser Alltrans Express U.S.A., Inc. (Alltrans). In light of this agreement, and in lieu of judicial foreclosure of the Sullivan certificates, the Bank accepted an "Unconditional and Irrevocable Bill of Sale" from Sullivan Lines, whereby that company "unconditionally . . . convey(ed) to the Union National Bank of Pittsburgh all of their right, title and interest in and to that certain Certificate of Public Convenience and Necessity." App. 214a.
 
 
 6
 On January 26, 1977, the Bank and Alltrans filed applications with the ICC for approval of (1) permanent transfer of the Sullivan certificates to Alltrans and (2) temporary operating authority rights by Alltrans under 49 U.S.C. § 310a(b).[3] On February 16th, the ICC by order denied the application for temporary operating authority. App. 234a-38a.
 
 
 7
 While the February 16th Order concededly recites the statutory standard to be satisfied for a grant of temporary operating authority, see note 3 supra, a reading of that order indicates that in fact the mandated standard was disregarded. Rather, the thrust of the order focused on Schreiber's purported misconduct and the ICC's fear that if temporary authority were granted, it would "as a practical matter . . . render revocation (as against Schreiber's successor) unavailable" to remedy Schreiber's alleged misconduct. App. 238a. The Bank and Alltrans immediately filed petitions for reconsideration of the February 16th Order.
 
 
 8
 On April 15, while still awaiting the ICC's reconsideration rulings, the Bank petitioned this Court under 28 U.S.C. § 2342[4] for review of the February 16th Order. Seven days later, the ICC denied the Bank's and Alltrans's petitions for reconsideration (April 22nd Order), again implying that the Bank's interest was subject to revocation proceedings. The ICC at this time also furnished supplemental reasons for its denial of temporary operating authority to Alltrans: absence of evidence of "adequate and continuous (carrier) service" to the public by Sullivan or the Bank, and failure of the Bank to notify the ICC that it intended to continue Sullivan's operations under 49 C.F.R. § 1132.6 (temporary operations by a fiduciary). With its attempted conduct of temporary operations twice thwarted, Alltrans exercised its right to terminate its contract to purchase Sullivan Lines.[5]
 
 
 9
 Undaunted, the Bank filed with this Court, on May 12, 1977, a motion captioned "Motion for Declaratory Judgment and Request for Expedited Disposition of all Issues." That motion sought a judgment declaring that:
 
 
 10
 (a) Upon appropriate notice to the Commission and observance thereafter of compliance procedures of the type contemplated by 49 CFR § 1132.6(b), the Bank has sufficient proprietary interest in the subject certificate to entitle it to conduct operations thereunder as "successor in interest to Sullivan Lines, Inc.", and
 
 
 11
 (b) the Bank's interest in the certificates may not be destroyed by prospective revocation of the certificate under a proceeding instituted subsequent to January 12, 1977 pursuant to section 212(a) of the Interstate Commerce Act, 49 U.S.C. § 312(a) and predicated on past acts or conduct of any person other than The Union National Bank of Pittsburgh or its employees or agents, and
 
 
 12
 (c) that Bank has such incidents of ownership of the subject certificate that Bank is and shall be a necessary and proper party to any contract or agreement to lease or sell the subject certificate.
 
 
 13
 The ICC responded that these issues did not present a concrete controversy and hence were not justiciable, contending in support that no ruling had issued, nor any other action taken, which adversely affected the Bank's interests. This Court, by order, expedited the Bank's appeal and granted the Bank's petition for review of the April 22nd Order.[6]
 
 II.
 
 14
 The court of appeals has exclusive jurisdiction to review only "rules, regulations or final orders of the Interstate Commerce Commission." 28 U.S.C. § 2342(5). If an order or other agency action is not final and if it is not a rule or regulation it is not reviewable in the courts of appeals in the first instance. Citizens for a Safe Environment v. Atomic Energy Commission, 489 F.2d 1018, 1020 (3d Cir. 1973). It may of course be reviewable in the district courts pursuant to other jurisdictional statutes.[7] Id. With this principle in mind, we turn to the Bank's claims for relief.
 
 
 15
 Although the Bank has apparently sought alternative forms of relief (review of the ICC Orders of February 16th and April 22nd, on the one hand, and, by its motion of May 12th, issuance of a "declaratory judgment" on the other), we are foreclosed by our jurisdictional limitations from considering the subject of the May 12th motion.[8] In contrast, the petition to review the February 16th Order and the Bank's subsequent motion to include for our consideration the April 22nd Order are, by statute, reviewable by us. Thus appellate jurisdiction to entertain the Bank's petition is properly invoked. Accordingly we have before us only the propriety of the ICC's rulings which denied temporary operating rights.[9] Neither order, as we read them, seeks to adjudicate either the Bank's proprietary interest under 49 C.F.R. § 1132.6[10] or its status as a party to the transfer of the certificates, as presented by the Bank's May 12th motion. Hence we find it unnecessary to consider the May 12th motion as a predicate for our jurisdiction, inasmuch as the February 16th and April 22nd Orders permit our review under § 2342(5).
 
 III.
 
 16
 The ICC nonetheless argues that this proceeding stemming from its Orders of February 16th and April 22nd should be dismissed, because Alltrans has withdrawn from its contract of purchase, thereby mooting the controversy created by the denial of temporary operating rights. We do not agree. Not only is the ICC's action "capable of repetition yet evading review," Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974), quoting Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed.2d 310 (1911), but the effects of that action will undoubtedly continue until, if ever, the Bank can dispose of the certificates. See id.
 
 
 17
 The ICC's denial of temporary operating rights predicated upon Schreiber's misconduct necessarily encumbers the Sullivan certificates and renders them effectively inalienable.[11] Thus it is highly probable that any prospective purchaser of the certificates would include in the contract of purchase, as did Alltrans, a provision permitting withdrawal from the contract in the event of ICC denial of permanent or temporary operations.[12] In that situation, which will inevitably recur, the Bank may never obtain judicial review of an ICC Order which denies the transfer of the Sullivan certificates based on the conduct of its transferor.
 
 
 18
 Moreover, the "continuing effects" doctrine of Super Tire Engineering Co. v. McCorkle, supra, militates against mootness, as it is apparent that despite Alltrans's withdrawal from the contract of purchase, the Bank is still subject to the ICC's determinations concerning the effect of Schreiber's activities as they pertain to the Sullivan certificates.
 
 
 19
 In Super Tire, an employer petitioned for review of the validity of strikers' receipt of public assistance benefits. The workers' strike had ended long before appellate review could be had. Still, the Supreme Court found the controversy justiciable:
 
 
 20
 We hold that the facts here provide full and complete satisfaction of the requirement of the Constitution's Art. III, § 2, and the Declaratory Judgment Act, that a case or controversy exist between the parties. . . . (T)he challenged governmental activity in the present case is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence (during collective bargaining sessions), casts what may well be a substantial adverse effect on the interests of the petitioning parties.
 
 
 21
 416 U.S. at 122, 94 S.Ct. at 1698. Similarly here, the effect of the February 16th Order (and thereafter the April 22nd Order) on the transferability of the Sullivan certificates "has not evaporated or disappeared, and, by its continuing and brooding presence," necessarily affects the Bank's interests in the certificates.
 
 
 22
 Accordingly, we find the ICC's argument that this proceeding is moot, to be without merit. See Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 546-47, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); Super Tire Engineering Corp. v. McCorkle, supra, 416 U.S. at 125, 94 S.Ct. 1694; United States v. Frumento (Pisciotta), 552 F.2d 534, 536-41 (3d Cir. 1977) (en banc).
 
 IV.
 
 23
 Turning to the merits of this controversy, we confront the following issue: may the ICC under 49 U.S.C. § 310a(b) deny temporary operating authority to the transferee (through voluntary foreclosure) of certificates of public convenience and necessity, or to its successor, based upon the alleged misconduct of the transferor?
 
 
 24
 Section 210a(b) of the Interstate Commerce Act, 49 U.S.C. § 310a(b), provides:
 
 Temporary authority
 
 25
 (b) Pending the determination of an application filed with the Commission for approval of a consolidation or merger of the properties of two or more motor carriers, or of a purchase, lease, or contract to operate the properties of one or more motor carriers, the Commission may, in its discretion, and without hearings or other proceedings, grant temporary approval, for a period not exceeding one hundred and eighty days, of the operation of the motor carrier properties sought to be acquired by the person proposing in such pending application to acquire such properties, if it shall appear that failure to grant such temporary approval may result in destruction of or injury to such motor carrier properties sought to be acquired, or to interfere substantially with their future usefulness in the performance of adequate and continuous service to the public.
 
 
 26
 (Emphasis added.)
 
 
 27
 The last clause of the statute specifies the standard for the grant of temporary authority: the ICC must find either (1) injury to the carrier properties or (2) substantial interference with future service to the public. Thus, although judicial review of ICC action under § 310a(b) is narrowly limited,[13] the court must assure compliance with the applicable statutory standard. Movers' & Warehousemen's Ass'n of America v. United States, 303 F.Supp. 563, 568 (D.N.J.1969) (three-judge court); see Jones Truck Lines, Inc. v. United States, 303 F.Supp. 234 (W.D.Ark.1969) (three-judge court) (mem.), citing Roadway Express Inc. v. United States, 263 F.Supp. 154 (N.D.Ohio 1966); Caravelle Express, Inc. v. United States, 287 F.Supp. 585, 589 (D.Neb.1968) (three-judge court), quoting United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1945) (reviewing court may intervene if "there has been a prejudicial departure from requirements of the law or an abuse of the Commission's discretion").
 
 
 28
 As we have noted earlier, in its February 16th Order the ICC virtually ignored the standard prescribed in § 310a(b). We have reproduced the entire Order of February 16th in the Appendix. However, those portions of the Order particularly relevant to our discussion read:
 
 
 29
 It further appearing, That Section 210a(b) (49 U.S.C. § 310a(b)) provides two standards by which the Commission may grant temporary authority thereunder, namely, whether denial of such temporary authority would (1) result in destruction of or injury to motor carrier properties sought to be acquired, or (2) interfere substantially with their future usefulness in the performance of adequate and continuous service to the public, but regardless of what it may find in regard to either standard, the Commission has the discretion, for good cause, to withhold section 210a(b) temporary authority; and that, in this proceeding there is good cause for denying waiver of Rule 240(d)(5) and withholding Section 210a(b) temporary authority, as specified in greater detail below;
 
 
 30
 It further appearing, That, this Commission, through its Bureau of Investigations and Enforcement and Bureau of Operations, has under way several investigations regarding the conduct of Harry Schreiber, Sullivan, and, among other things, their relationships with the Bank; that in these investigations this Commission has taken note of numerous facts which may reflect a course of conduct requiring corrective action, that in deference to the overriding public interest in protecting the transportation system and the regulatory structure, this Commission's enforcement and compliance functions require that the option of revoking the Sullivan rights should be retained as a remedy in the indicated circumstances, as contemplated by Section 212(a);
 
 
 31
 (The succeeding paragraph recites various activities of Schreiber, including references to criminal and civil charges involving Schreiber's companies.)
 
 
 32
 It further appearing, That an objective of the on-going investigations involving, among other things, the conduct of Harry Schreiber and those associated with him in the purchase and sale of Sullivan and/or its rights, is to determine not only whether that conduct was in willful violation of the law, but also whether it reflected a habit of disdainful contumacy toward, and cavalier flouting of, the law and regulation; that, in view thereof, this Commission must be concerned about the availability of effective remedies, about whether divestiture alone would be adequate and whether it would be consistent with good order to permit a carrier or affiliated person to profit from its wrongdoings; that this concern is not equivalent to a prejudgment of the matters under investigation, but is rather a realistic recognition of (a) the gravity of the issues in terms of maintaining a meaningful regulatory mechanism and (b) the probability that a grant of the sought temporary authority under Section 210a(b) would, as a practical matter in this case, render revocation unavailable as the compliance instrument for which it was intended by Section 212(a);
 
 
 33
 It further appearing, That, in the light of the operating authorities involved and the pending investigations of Schreiber and Sullivan, required in the overriding public interest for the protection of the transportation system, we find our discretionary powers under section 210a(b) to grant the application should not be exercised and we further find that the failure to grant temporary authority would not under the circumstances result in the destruction or injury to the operating rights involved or interfere substantially with their future usefulness in the performance of continuous and adequate service to the public;
 
 
 34
 App. 235a, 237-38a (emphasis in first paragraph added).
 
 
 35
 It is evident that although the ICC twice recited the statutory standard in its February 16th Order, it articulated no basis for its ruling other than Schreiber's misconduct. In so doing, the ICC diverged sharply from its statutory mandate.[14] Congress having limited the factors which the ICC may consider in the grant or denial of temporary rights, the ICC may not substitute its own standard for the legislative prescription. Here, while giving lip service to the statutory formula, no findings, explanations, or reasons appear in its order which would support a denial of temporary authority if limited to the statutory standards against which its action must be measured.
 
 
 36
 A fair reading of the ICC's order can only lead to the conclusion that the standards set by Congress were, despite token acknowledgement, not followed when the ICC refused authority for temporary operation. We have been shown no authority for such a departure, nor have we been shown that § 310a(b) encompasses within its purview the misconduct rationale employed by the ICC. If such actions by Schreiber taint the Bank's interest or the interest of its successor within the meaning of § 310a(b), then we are entitled to know how and by what means the standard of that statute has or has not been met. It does not suffice for these purposes merely to parrot the words of the statute. Rather the statute mandates that a substantive explanation be furnished by the ICC which would relate the indicted practice to the grant or denial of temporary rights when tested by the statutory standard.
 
 
 37
 Whether or not temporary rights tested by the applicable standard should have been denied cannot be determined from the February 16th Order. For as we have indicated, that order is deficient in its application of the § 310a(b) standard. Applying that standard correctly is a task to be undertaken in the first instance by the ICC. It is for that reason that we remand to the agency so that its function may be appropriately discharged.
 
 V.
 
 38
 One further question remains: did the ICC Order of April 22, 1977, which denied reconsideration of its February 16th Order, meet the statutory standard prescribed by § 310a(b), and if so, did it "cure" the deficiencies of the earlier order?
 
 
 39
 Upon the issuance by the ICC of its April 22nd Order, the Bank moved to amend its petition for review which had initially been filed in connection with the February 16th Order. That motion was granted, and hence we may review the April 22nd Order, as we have the February 16th Order, pursuant to 28 U.S.C. § 2342(5).
 
 
 40
 In relevant part, the April 22nd Order reads as follows:
 
 
 41
 (P 2) It appearing, That beyond the reasons provided in the Commission's order dated February 15 (16), 1977, for denying the instant application Sullivan Lines, Inc. (Sullivan), Bank, and Alltrans (all jointly referred to as applicants) have provided no evidence in the record of adequate and continuous service, or indeed of any service at all, to the public by Sullivan prior to Bank's foreclosure and taking possession of Sullivan's operating rights in certificate No. MC-47109 and MC-47109 (Sub-No. 7) (Rights); that applicants have provided no evidence of record of adequate and continuous operations of the Rights by Bank, or indeed of any service at all, since it foreclosed and took possession of the Rights on January 12, 1977; that Bank has failed to provide notice to the Interstate Commerce Commission (Commission) that it intends to continue Sullivan's operations, if any, as required by the Commission's regulations codified at 49 C.F.R. section 1132.6; that the evidence presented in the record does not show that failure to grant temporary approval would result in the destruction of, or injury to, the motor-carrier properties sought to be acquired, since section 210a(b) of the Act expressly requires an application for permanent approval of a purchase pursuant to section 5 of the Act before the Commission, and said application, Form OP-F-44, requires an abstract showing actual shipments transported under the operating authority involved in the proposed transaction, and that no such evidence was presented in connection with that section 5 application here or in the section 210a(b) temporary authority proceeding immediately involved; and that, accordingly, there is also no evidence in the record to show that, at this time, failure to grant temporary approval would interfere substantially with their future usefulness in the performance of adequate and continuous service to the public;
 
 
 42
 (P 9) It further appearing, That there are no other issues raised in the petitions for reconsideration which set forth facts or arguments not considered by the Commission, in its order dated February 15 (16), 1977, which warrant a contrary conclusion or constitute sufficient or proper cause for granting the relief sought:
 
 
 43
 It is ordered, That the said petitions be, and they are hereby, denied.
 
 
 44
 By the Commission.
 
 
 45
 App. 309a, 311a.
 
 
 46
 Even though the ICC by its later order appears to have conformed to the statutory standard set forth in § 310a(b), we are still unable to determine from what has been presented to us "whether the Commission has refrained from acting in a manner which is arbitrary, capricious, or an abuse of discretion, or otherwise stated, whether there is some evidence in the record to support the Commission's decision." Garrett Freightlines, Inc. v. United States, 540 F.2d 450, 451 (9th Cir. 1976) (per curiam) (emphasis added). Our inability to determine whether the April 22nd Order has cured the ICC's earlier order stems from a number of considerations.
 
 
 47
 First, while we recognize that the April 22nd Order does in its terms treat with the statutory standard, it also appears to rely heavily on matters extraneous to that standard. Second, we cannot ignore the underlying struggle that has permeated this entire controversy and which resulted in the promulgation of the February 16th Order dealing with considerations foreign to the statute, i. e., Schreiber's misconduct. It is unclear to us whether the April 22nd conclusions are grounded in fact or are mere pretextual afterthoughts which would support its earlier order. Third, the April 22nd Order not only refers to the February 16th Order but, by serving as a supplement to the earlier order, see P P 2, 9, can only be read as incorporating that order in full. This leads to the inevitable conclusion that if, as we have held the February 16th Order is without statutory authority, then the April 22nd Order must be "tainted" to the same extent. Hence rather than operating as a "cure", the April 22nd Order has in our view given renewed vitality to the February 16th Order which is still extant and which therefore still affects the Bank's interest in the Sullivan certificates in an unauthorized manner by applying standards not found in the statute.
 
 
 48
 Lastly, we note that our concern, as appears by our discussion, has been solely with the issue of the propriety of the denial by the ICC of temporary operating authority. It has not and cannot concern itself with the merits of whether conduct of a transferor can result in revocation of a certificate in the hands of its transferee. We express no views here as to this subject.
 
 
 49
 Having substantial doubt under any standard of review as to whether the April 22nd Order, when read in tandem with the February 16th Order, complies with § 310a(b),[15] it would appear appropriate to us that we remand to the ICC for consideration of whether temporary operating authority should be granted under the standard set forth in § 310a(b) without reference to collateral considerations unrelated to the statutory standard by which the ICC is bound.
 
 VI.
 
 50
 Having concluded that it is necessary to remand the proceedings to the ICC for the appropriate statutory determinations discussed above, we will grant the Bank's petition to review the February 16th and April 22nd Orders to the extent necessary to achieve that objective. The instant matter will therefore be remanded for proceedings consistent with the foregoing opinion.
 
 APPENDIX
 Order Dated February 16, 1977
 ORDER
 
 51
 At a General Session of the Interstate Commerce Commission, held at its office in Washington, D.C., on the 15th day of February, 1977.
 
 No. MC-F-13105
 
 52
 Alltrans Express U.S.A., Inc. Purchase Sullivan Lines, Inc.
 
 
 53
 It appearing, That, by application filed January 26, 1977, authority is sought under Section 5 of the Interstate Commerce Act, for Alltrans Express U.S.A., Inc. (Alltrans), herein called lessee, of Lake Success, N. Y. to purchase the motor-carrier operating authorities of Sullivan Lines, Inc., nominal holder, (Sullivan), and the Union National Bank of Pittsburgh, assignee in foreclosure, (Bank), herein called lessors, both of Pittsburgh, PA, and for Alltrans Incorporated, of San Francisco, CA, and in turn, Thomas Nationwide Transport Limited, of Redfern, Australia, to acquire control of the said properties through the purchase; that, by separate application, also filed January 26, 1977, approval is sought under Section 210a(b) for the temporary operation of the said properties by lessee; and that applicants have requested immediate approval of the proposed temporary operation and waiver of Rule 240(d)(5);
 
 
 54
 It further appearing, That the sale of the Sullivan operating authorities is contingent, among other things, upon this Commission's authorizing temporary operations thereunder by Alltrans under Section 210a(b), pending determination of the purchase application under Section 5 and further contingent upon a "noncompete" agreement under which Harry Schreiber, formerly the sole stockholder of Sullivan's corporate parent, agrees not to engage in motor carrier operations for a period of eight years subsequent to the said grant of temporary authority, and to divest his freight forwarder properties in return for which Alltrans will compensate him in the amount of $800,000.00 to be paid over the 8-year period.
 
 
 55
 It further appearing, That Section 210a(b) provides two standards by which the Commission may grant temporary authority thereunder, namely whether denial of such temporary authority would (1) result in destruction of or injury to motor carrier properties sought to be acquired, or (2) interfere substantially with their future usefulness in the performance of adequate and continuous service to the public, but regardless of what it may find in regard to either standard, the Commission has the discretion, for good cause, to withhold section 210a(b) temporary authority; and that, in this proceeding there is good cause for denying waiver of Rule 240(d)(5) and withholding Section 210a(b) temporary authority, as specified in greater detail below;
 
 
 56
 It further appearing, That, this Commission, through its Bureau of Investigations and Enforcement and Bureau of Operations, has under way several investigations regarding the conduct of Harry Schreiber, Sullivan, and, among other things, their relationships with the Bank; that in these investigations this Commission has taken note of numerous facts which may reflect a course of conduct requiring corrective action, that in deference to the overriding public interest in protecting the transportation system and the regulatory structure, this Commission's enforcement and compliance functions require that the option of revoking the Sullivan rights should be retained as a remedy in the indicated circumstances, as contemplated by Section 212(a);
 
 
 57
 It further appearing, That, in addition to the numerous matters being investigated, Schreiber Freight Lines, Inc. (SFL), owned and controlled by Harry Schreiber, in December, 1973, paid a civil forfeiture of $2,000.00 for operating beyond the scope of its authority; by order of September 30, 1976, in No. MC-C-8507, Schreiber-Invest. of Opers. & Revoc. of Certifs., this Commission, Division 1, suspended for 45 days, the operating authority of SFL and an affiliated carrier, Dorothy H. Loughman, doing business as Waynesburg-Pittsburgh Local Express, for violations of the Interstate Commerce Act in connection with their operations and unlawful acquisition of common control; in October, 1974, an investigation of SFL and three affiliated carriers resulted in allegations of SFL fraudulently seeking to evade or defeat regulation by use of false, fictitious or fraudulent writings and willful misstatements of material facts and transporting property without authority, which allegations were referred to the U.S. Attorney with a recommendation that an indictment be sought subsequent to which the matter was prosecuted and on July 1, 1976, the jury returned a verdict of guilty as to SFL and the General Sales Manager on 13 counts of furnishing false documents to the Government and five counts of fraud by wire; that witnesses at the trial testified that SFL employees fabricated letters and mailgrams to this Commission in an effort to obtain temporary authority for SFL; that following these revelations and upon cancellation of temporary authority previously given by this Commission, Harry Schreiber and others sought to form two agricultural cooperatives whose conduct is subject to the pending investigations; that in connection with the said investigations, it was necessary to obtain subpoenas duces tecum in order to obtain access to the records of Bank, that the efforts to obtain such access required litigation by this Commission to the Circuit Court of Appeals for the Third Circuit; that, in connection with the acquisition of the Sullivan stock by Harry Schreiber, it was recognized that Section 411(a) prohibits the acquisition of a motor carrier by a person controlling a freight forwarder; that on August 14, 1975, Harry Schreiber conveyed title of two freight forwarders which he controlled to an employee of SFL subject to an irrevocable option to repurchase them within one year; that on August 15, 1975, Harry Schreiber, presumably as a non-carrier, obtained control of Sullivan through stock purchase without approval of this Commission; that on October 18, 1975, Harry Schreiber exercised the option to repurchase the two freight forwarders; that in No. MC-C-8507, supra, Harry Schreiber, as respondent, argued that he had sold SFL and the subsidiary freight forwarders in a sincere effort to divorce himself from control of the operations there under investigation; that the Florida Public Service Commission, by order of September 15, 1976, concluded that "Schreiber has no intention of complying with or observing the laws of this State touching motor vehicle operations or any of the Commission's orders, rules, or regulations pertaining thereto," and revoked Schreiber's intrastate certificate and in addition assessed a fine of $16,400.00; and that in addition, this Commission has settled a civil forfeiture claim against SFL in the amount of $1,200.00 for unauthorized operations and obtained a permanent injunction against SFL for continued transportation of certain property without ICC authority; that these and other facts are indicative of a course of conduct, the remedy for which may require revocation; and that a grant of the temporary authority to lessee at this time would present difficulties, as a practical matter, to employ revocation as a remedy upon completion of the investigations, even if, at that time, an overriding public interest were found to warrant revocation;
 
 
 58
 It further appearing, That an objective of the on-going investigations involving, among other things, the conduct of Harry Schreiber and those associated with him in the purchase and sale of Sullivan and/or its rights, is to determine not only whether that conduct was in willful violation of the law, but also whether it reflected a habit of disdainful contumacy toward, and cavalier flouting of, the law and regulation; that, in view thereof, this Commission must be concerned about the availability of effective remedies, about whether divestiture alone would be adequate and whether it would be consistent with good order to permit a carrier or affiliated person to profit from its wrongdoings; that this concern is not equivalent to a prejudgment of the matters under investigation, but is rather a realistic recognition of (a) the gravity of the issues in terms of maintaining a meaningful regulatory mechanism and (b) the probability that a grant of the sought temporary authority under Section 210a(b) would, as a practical matter in this case, render revocation unavailable as the compliance instrument for which it was intended by Section 212(a);
 
 
 59
 It further appearing, That, in the light of the operating authorities involved and the pending investigations of Schreiber and Sullivan, required in the overriding public interest for the protection of the transportation system, we find our discretionary powers under section 210a(b) to grant the application should not be exercised and we further find that the failure to grant temporary authority would not under the circumstances result in the destruction or injury to the operating rights involved or interfere substantially with their future usefulness in the performance of continuous and adequate service to the public;
 
 
 60
 It is ordered, That the request for waiver of Rule 240(d)(5) and the said application for temporary authority under Section 210a(b) be, and they are, hereby denied.
 
 
 61
 By the Commission (Commissioner O'Neal concurring in result).
 
 
 62
 Note: This decision is not a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969.
 
 
 
 *
 The Honorable Frederick B. Lacey, United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 Quoted n. 3 infra
 
 
 [2]
 Apparently the investigation concerns Harry Schreiber and conduct attributable to him relating to the Sullivan certificates which he had acquired and which the Bank now holds
 
 
 [3]
 Section 210a(b) of the Interstate Commerce Act, 49 U.S.C. § 310a, provides:
 Temporary authority
 (b) Pending the determination of an application filed with the Commission for approval of a consolidation or merger of the properties of two or more motor carriers, or of a purchase, lease, or contract to operate the properties of one or more motor carriers, the Commission may, in its discretion, and without hearings or other proceedings, grant temporary approval, for a period not exceeding one hundred and eighty days, of the operation of the motor carrier properties sought to be acquired by the person proposing in such pending application to acquire such properties, if it shall appear that failure to grant such temporary approval may result in destruction of or injury to such motor carrier properties sought to be acquired, or to interfere substantially with their future usefulness in the performance of adequate and continuous service to the public.
 
 
 [4]
 Section 2342 of Title 28 provides in relevant part:
 The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of
 (5) all rules, regulations, or final orders of the Interstate Commerce Commission made reviewable by section 2321 of this title.
 Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.
 
 
 [5]
 In a letter dated May 16, 1977, counsel for Alltrans advised the ICC as follows:
 The Commission's failure to grant the requested immediate emergency temporary approval under § 210a(b) of the operation and preservation of the carrier properties involved in the captioned proceeding has depleted the value and usefulness of those properties to where they are worth far less than the.$4.5 million purchase price which Alltrans Express U.S.A., Inc. contracted to pay the owner, The Union National Bank of Pittsburgh.
 This is to advise that applicant Alltrans Express U.S.A., Inc. has, therefore, exercised its right to terminate the contract, and does not propose to further prosecute the applications.
 Exhibit A to Response of Petitioner to Memorandum in Opposition to Motion for Declaratory Judgment (May 26, 1977).
 
 
 [6]
 Intervention was sought by agents, fleet-owners and owner-operators of carrier lines which competed with Sullivan Lines. Their argument on appeal was summarized as follows:
 Any attempt by Intervenors at this stage to argue the correctness of their position is all but impossible because we have not been afforded an opportunity to plead our interests so that the Commission might decide upon the request for transfer pursuant to 49 U.S.C. § 5(2)(c)(4). This is not the fault of the ICC but that of the Bank by its premature institution of an appeal prior to the exhaustion of its administrative remedies. In light of these circumstances, the issue before this Court now appears to be moot, but the fact remains that before any individual, partnership, or corporation commences operating the Certificate, the Commission and the Court must look into the effect of that transfer upon employees, agents, owner operators and fleet operators of Sullivan.
 Intervenors' Brief at 3. Our disposition of this appeal does not prejudice their position in any subsequent proceeding.
 
 
 [7]
 E.g., 28 U.S.C. § 1337; cf. id. § 2321(b)
 
 
 [8]
 As earlier noted, the Bank sought a declaratory judgment with respect to three issues. The first declaration sought was that the Bank had "a sufficient proprietary interest" in the Sullivan certificates so as to entitle it to conduct operations as a "successor in interest" to Sullivan Lines under 49 C.F.R. § 1132.6. See note 10 infra. We note that the ICC has not denied that interest and conceded as much in oral argument. See Transcript of Oral Argument at 14-15, 16
 The second declaration sought by the Bank is that its interest in the Sullivan certificates is not subject to revocation based upon past conduct of its transferor. That issue is considered in our discussion only insofar as it relates to the grant or denial of temporary operating authority. See B. F. Goodrich Co. v. Northwest Industries, Inc., 424 F.2d 1349, 1359 (3d Cir.), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970). As indicated in text, see page 751 infra, we express no view on whether misconduct of a transferor can or should result in revocation of the certificates in the hand of a successor.
 The third judgment sought by the Bank was a declaration that the Bank is a necessary party to the conveyance of the Sullivan certificates. Again, we do not understand the ICC to dispute that status. See Transcript of Oral Argument at 12-13. See generally id. at 21.
 
 
 [9]
 We recognize that the April 22nd Order denying reconsideration of the February 16th Order which refused temporary authority includes language which pertains to revocation. Nevertheless the issue of revocation was neither before the ICC nor decided by it. Moreover the record reveals that the ICC has not yet initiated revocation proceedings under 49 U.S.C. § 312(a). See Transcript of Oral Argument at 13. The April 22nd Order did no more than deny the petition for reconsideration of its February 16th Order
 
 
 [10]
 49 C.F.R. § 1132.6 provides under certain conditions for temporary operation of a carrier line by "fiduciaries," "assignees, or other persons authorized by law to collect and preserve property of financially disabled . . . holders."
 
 
 [11]
 Union National Bank is admittedly in a precarious position. It holds collateral of certificates of public necessity issued by the ICC but, because of ICC action, cannot dispose of them nor salvage their value. The Bank has already lost one purchaser and the accompanying.$4.5 million purchase price. This loss is directly attributable to the purchaser's perceived loss of value of the certificates resulting from the ICC Orders of February 16th and April 22nd. See Letter from Alltrans Counsel to the ICC, dated May 16, 1977, quoted in part in note 5 supra. Moreover, it is doubtful whether the Bank's inability to convey the certificates free of the encumbrance imposed by these Orders will ever permit the Bank to realize value on the certificates
 
 
 [12]
 Any action of the ICC which denies temporary operating rights appears crucial to the transfer of permanent operating rights, in light of the significance of timing in the operations of a carrier line. See, e. g., Letter from Alltrans Attorney to the ICC dated May 16, 1977, quoted in note 5 supra; cf. ICC Form OP-F-44, authorized under 49 C.F.R. §§ 1003.1(a) and 1134.1, which embodies the ICC dormancy doctrine, whereby in an application for a transfer of certificates, "dormancy will be assumed respecting operating authority for which no shipments are shown" for the preceding six months
 
 
 [13]
 E. g., Garrett Freightlines, Inc. v. United States, 540 F.2d 450, 451 (9th Cir. 1976) (per curiam) ("our sole inquiry is whether the Commission has refrained from acting in a manner which is arbitrary, capricious, or an abuse of discretion, or, otherwise stated, whether there is some evidence in the record to support the Commission's decision"); Schenley Distillers Corp. v. United States, 50 F.Supp. 491, 496 (D.Del.1943) (three-judge court) (ICC act is subject to review "only when its conclusions are arbitrary or capricious or where it has acted without authority of law or has committed an error of law"); accord, Navajo Freight Lines, Inc. v. United States, 320 F.Supp. 318 (D.N.M.1970) (three-judge court)
 
 
 [14]
 Our research has revealed no other case in which the ICC has attempted to depart from the statutory standard under § 310a(b). Rather, all cases have focused on whether the ICC properly gauged certain factors relating to the public interest which supported a grant or denial of temporary operations, such as the need for the proposed carrier service, competitive conditions in the industry, etc. See, e. g., Barrett Mobile Home Transport, Inc. v. United States, 381 F.Supp. 1317, 1328-29 (D.Minn.1973) (three-judge court) (reversal for failure to consider all relevant factors); Mobile Home Express, Ltd. v. United States, 354 F.Supp. 701 (W.D.Okl.1973) (three-judge court) (affirmance)
 The ICC argues that agency enforcement power against misconduct is enhanced by the revocation of the Sullivan certificates; hence this potential for revocation is a permissible basis for a § 310a(b) denial. The latter proposition does not follow from the former. The agency may employ all statutorily-approved sanctions against a party who violates the Interstate Commerce Act. Under § 310a(b), however, the ICC is empowered to deny temporary operating authority only in the absence of injury to the carrier line or public need for transport lines. The ICC has not demonstrated that it is empowered to deny this authority for misconduct of a transferor who assigned his certificates in foreclosure.
 
 
 [15]
 An ICC order which denies reconsideration of an earlier order, as does the April 22nd Order, does not divest the earlier order of its finality. Cf. Provisioners Frozen Express, Inc. v. ICC, 536 F.2d 1303, 1305 (9th Cir. 1976) (per curiam) (agency order which refused to grant reconsideration of earlier proceedings did not create a new final order which furnishes appellate jurisdiction to review earlier proceedings)